## ÆTNA INS. CO. v. ENGLISH.

### No. 14859.

Court of Civil Appeals of Texas. Fort Worth.

Sept. 19, 1947.

Rehearing Denied Oct. 24, 1947.

SPEER, Justice.

H. E. English, doing business in the trade name of Red Ball Motor Freight Lines, hereinafter called plaintiff, sued Ætna Insurance Company, hereinafter called defendant, on a policy of insurance alleged to cover the loss by theft of merchandise while in the possession of plaintiff for transportation over his motor freight lines.

On and prior to June 12, 1944, plaintiff was engaged in the transportation of merchandise and other commodities, including whisky, from one point to another in this state. Prior to the last date mentioned, defendant had issued its policy insuring plaintiff against loss by theft of freight while in plaintiff's possession. The policy was in effect on June 12, 1944; one provision in the policy was to the effect that the liability of the defendant should be the amount of the loss resulting from theft, less $100.

On June 12, 1944, plaintiff received at Dallas, Texas, for transportation to Kilgore, Texas, 84 cases of whisky, loaded it onto his motor truck and began its transportation to destination. When the truck arrived at Kilgore, the cases of whisky were removed from the truck, placed in the warehouse, and then counted. It was found by the count that there were only 59 cases of whisky, 25 cases short of the 84 cases alleged to have been loaded onto the truck at Dallas.

Trial was to a jury on special issues. The verdict was (1) 84 cases of whisky were loaded onto plaintiff's truck at Dallas for transportation to Kilgore; (2) 25 cases of whisky were lost; (3) the loss was the result of a theft. Under Rule 169, Texas Rules Civil Procedure, defendant admitted that the value of the lost liquor at Dallas was $1,004.09. Deducting the $100.00 provided for in the policy, judgment was entered for plaintiff for $904.09, from which judgment defendant has appealed.

By three points of error, defendant challenges the sufficiency of the evidence to support the jury finding that the loss of the 25 cases of whisky was the result of a theft. In its brief, defendant frankly submits that the sole question for

Bailey & Milam and Tom S. Milam, all of Dallas, for appellant.

Rawlings, Sayers & Scurlock, Nelson Scurlock and Reagan Sayers, all of Fort Worth, for appellee.

this court to determine is, does the evidence support the jury finding that the loss was the result of a theft?

Both at the conclusion of plaintiff's testimony, and when all testimony was in, defendant presented and requested the court to give a summary instruction in its favor, based upon the contention that there was no testimony of probative value before the court from which a jury could properly find that a theft had been committed. The court overruled both motions. The points of error relied upon, attacking the sufficiency of the evidence to support the verdict, raise the same point as did the motions for an instructed verdict. We have concluded that the court properly overruled both motions for an instructed verdict; that there was sufficient evidence to raise an issue to go to the jury, and the jury having resolved the question of fact against defendant there is evidence of probative value to support the verdict.

In view of these conclusions it becomes necessary to refer more in detail to the evidence than we would if its sufficiency was not so challenged.

It seems indisputably true that plaintiff received at Dallas, Texas, 84 cases of whisky for transportation to Kilgore, Texas. The jury found this to be true. The 84 cases of whisky came from several consignors, and by means of pick-up trucks, the shipments were gathered together at plaintiff's dock in Dallas. The dock is about 50 feet wide, one side facing north and the other south. The means employed for final loading onto what was called the "line truck", which was to carry the freight to its destination, appears to be that the pick-up trucks backed up to the dock and parked on the north side while the line truck stood on the south side ready for loading. The cases of whisky were wheeled in hand trucks from the pick-up trucks, across the dock and there placed in the line truck.

There is testimony that the cases of whisky in controversy were handled and checked in a manner different to that used in handling general freight.

Plaintiff offered the testimony of O. M. McCulloch, dock superintendent at Dallas,

F. N. Tresenriter, a helper at the Dallas dock, and L. J. Porter, the driver of the truck in which the whisky was transported. Tresenriter was still in the employ of plaintiff at the time of trial while McCulloch and Porter were not.

Defendant offered as a witness S. T. Curry, not in the employ of plaintiff at the time of trial, but who was dock superintendent in Kilgore at the time of the shipment.

Mr. McCulloch testified in effect, that: On the evening of June 12, 1944, plaintiff's pick-up trucks had assembled the shipment of whisky at plaintiff's dock in Dallas at about 8 p. m. The shipment constituted less than a line-truck full load. There were 15,000 to 20,000 pounds of general freight, aside from the whisky, to be loaded into the line truck destined to Kilgore and intermediate points; he caused the general freight consigned to Kilgore to be loaded into the truck first and placed it near the front end of the large trailer or van type line truck. He detailed loading of the whisky consigned to Kilgore into the truck. Tresenriter was stationed on the north side of the dock next to the pick-up trucks and facing south toward the line truck. A Mr. Beauman (who did not testify) was stationed on the south side of the dock, next to the line truck, facing the pick-up trucks. Each, Tresenriter and Beauman, was given a blank sheet of paper and instructed by McCulloch to count the number of cases of whisky wheeled across the dock from the pick-up trucks to the line truck. As the cases of whisky were wheeled across the dock, each of these checkers would make a straight mark on his sheet of paper for each case of whisky that crossed the dock and was loaded into the line truck. When the loading of the whisky was completed, the two checkers compared their sheets of paper used in counting the cases, and were found to correspond precisely, showing that 84 cases of whisky had been loaded into the line truck. The two sheets were handed to Mr. McCulloch and he also compared them and found that they corresponded in number and, as was his custom in such matters, he retained one of the sheets and destroyed the other. He did not know

which of the checkers, Tresenriter or Beauman, made the sheet retained by him, but that they were both the same. The sheet retained by him was introduced in evidence and appears in the record, showing that 84 cases of whisky were loaded into the line truck.

Mr. McCulloch further testified in effect, that: He then supervised the loading of about 8,000 pounds of general freight, including some cases of vinegar, consigned to Tyler, Texas, in the back end of the line truck so that it could be unloaded at Tyler, an intermediate point between Dallas and Kilgore.

The witness Tresenriter testified to a state of facts in regard to his connection with the loading of the whisky into the line truck, coinciding with that of McCulloch in respect thereto. He further testified that since he was checking from the north side of the dock at Dallas, he was facing the line truck on the south side, and saw each hand-truck load which he had counted go into the line truck.

L. J. Porter, the driver of the line truck from Dallas to Kilgore, testified in effect, that: He was advised that he was to drive plaintiff's line truck from Dallas to Kilgore that night and arrived at the dock in Dallas about 8 p. m.; they were loading the truck when he arrived; he knew nothing about its contents while it was being loaded but that he was advised by Mr. McCulloch that the truck was loaded and ready to go, that it contained a shipment, among other things, of whisky, and it would be necessary for him to sign the loading tickets of that commodity. He was presented with the ticket or slip of paper showing that 84 cases of whisky had been loaded into the truck and was requested to sign it; he did so, relying upon what the paper purported to show; he received his bills, showing the items of freight contained in his truck and their respective destinations. He described the line truck trailer van as being a steel structure, with an opening only in the rear. The doors designed to close the opening in the rear, consisted of two shutters, extending to the top of the trailer, hinged on the sides, swinging back to the right and left. They extended downward to within two or two and one half feet from the bottom, or floor, of the trailer van; the bottom of the opening closed with what he termed "the tail gate", hinged at the bottom and when opened, drops outward and forms a platform across which hand trucks may be rolled from the floor of the van to a dock; in closing the rear end of the van the tailgate part is to be first raised to a closed position, and then the upper two doors are closed and a groove on the bottom of the two upper doors interlocks with a corresponding one on the top part of the tailgate door; when they are so closed, there is a hand latch to be turned, causing metal bars to cross the joints of the three doors; it was impossible to open the back end of the van without first turning the hand latch in the reverse direction from which it was turned when the doors were fastened by it. The driver-witness further said that he left the Dallas dock about 8:30 p. m. and started on his usual route to Kilgore by way of Kaufman, Athens, and Tyler; a few miles out of Dallas, he passed another one of plaintiff's trucks standing by the roadside, headed toward Dallas; the driver was having trouble with his motor; the witness stopped four or five minutes and learned the trouble of the other driver. He then drove his own truck a mile or more to a store where he stopped and telephoned back to the Dallas office and asked for some one to go to the aid of the other driver. Witness stopped again at Athens around 11:30 that evening, went into a cafe and ate supper with four or five other truck drivers. He said he left his truck in front of the cafe, and could see it at all times while he was inside eating. He said that at no time when his truck was stopped did any person go near it or have an opportunity to open it and remove anything from it. He went from Athens to Tyler where he stopped at plaintiff's warehouse around 1 o'clock a. m., and he, in person, unloaded about 8,000 pounds of freight consigned to Tyler, from the back end of the truck; he did not unload any whisky from his truck at Tyler; he saw the cases of whisky in his truck after he had unloaded the Tyler freight; he did not count them, nor did he really know how many cases were in his truck at that time; the cases were stacked in the

truck and he removed a small number of them from the top of the stacks and set them on the floor in the truck, in spaces left after unloading the Tyler freight. He closed all doors, including the tailgate of his truck after unloading the Tyler freight, and started to Kilgore. He missed the road out of Tyler and wandered around in the edge of the city and inquired as to his highway to Kilgore; he found it and drove directly to Kilgore; as he entered Kilgore, he stopped at a traffic signal and inquired of another truck driver the exact location of the plaintiff's warehouse in that city; the other driver led the way and witness followed to the warehouse. Witness further said that he made no stops between Tyler and Kilgore and that the doors of his truck had not been opened between those two points; when he arrived at Kilgore, the doors were closed and the hand latch intact. He arrived at Kilgore about 4 a. m. The superintendent of the warehouse lived nearby; the other truck driver, last mentioned, had a key to the warehouse, he unlocked the door, turned on the lights and went to arouse S. T. Curry, the superintendent, and ask him to come and check the freight out of both trucks.

Mr. Curry came, and Porter exhibited to him his bills, showing that the shipment contained whisky; he asked Curry to check the cases of whisky against his billing as it was unloaded from the truck; he said this was required under plaintiff's rules; Curry declined to do so and instructed the witness to take a two-wheel hand truck, stack the cases from his truck onto the wheeler, transport them from his truck across the dock and put them in the warehouse, and that he, Curry would stack them and count them in his own way; witness did this and did not count the number of cases he wheeled into the warehouse. When he had unloaded all of the cases of whisky from his truck, Mr. Curry had put them in the warehouse in stacks of even height; Curry then told him he was short in his shipment; witness, Curry, and the other truck driver then counted the cases as they were stacked in the warehouse and there were in those stacks only 59 cases of whisky, making the shipment 25 cases short.

Witness said in case of shortage in a shipment, he was required to report it promptly to the general office at Dallas. He asked Curry to telephone to the Dallas office then and there of the shortage; Curry declined to do so and said he would attend to it in due time; witness said his shipments had been short on former occasions, and this was the course he had pursued in such instances in the past. He also revealed that after the shipment in controversy, he was locked up two days and nights at Athens, Texas, and there "questioned, questioned, and questioned" about the shipment of whisky.

Witness said that after he had counted the cases of whisky in the stacks, he looked about in the warehouse and could find no other cases of whisky; there was a small room cut out in the warehouse and the door of that room was usually kept locked and he did not look inside of it; he said he could not account for the shortage of his shipment, unless it happened at the Kilgore warehouse, and that under the circumstances detailed by him it was possible for it to have been misplaced and lost in that warehouse.

Defendant offered S. T. Curry as a witness in its behalf and he testified in effect, that: On June 12, 1944, he was warehouse manager for plaintiff at Kilgore; his duties were to see that freight was received, protected and delivered to consignees, and to report shortages in shipments when delivered to him; at about 4 o'clock a. m. of the 13th he was awakened by one of plaintiff's truck drivers from Houston and asked to come to the warehouse and receive his freight along with that of Porter with the Dallas truck; the Houston driver was unloading his freight when witness arrived, and Porter was "unbuttoning" the tailgate of his truck which he had backed up to the dock; he said we began unloading Porter's truck which contained the shipment mostly of whisky. Witness said he removed most of the whisky himself on a hand truck and conveyed it to the warehouse; he tried to keep count as he removed it from the truck but stacked it in the warehouse and counted it again so as to have a double check on it; when he counted it in the warehouse there

were 59 cases—25 cases short; he was positive that no whisky was lost between the time unloading was started until he got to the warehouse. There was one other door to the warehouse but it was closed and locked; only the witness Porter and the other driver were around the warehouse during the time the whisky was being unloaded. He was working in a pawn shop at Dallas at the time of trial. Several drivers of plaintiff's trucks had keys to the warehouse at Kilgore but Porter did not have one. Immediately after witness arrived at the warehouse, he began unloading the whisky and it seemed to him that there was a small amount of general freight in the truck to be unloaded at Kilgore besides the whisky; witness went into the truck with a two-wheel hand truck, it was loaded with cases of whisky and he pushed it out each time to the warehouse and stacked it with a certain number of cases in each stack; he didn't remember whether he or Porter pushed the two-wheeler into the warehouse each time; but most of the time, Porter remained in the truck and stacked the cases ready for witness to place them on the two-wheeler truck for pushing into the warehouse; while witness was pushing the hand truck from the van to the warehouse, the bills were in the office. When witness had trucked into the warehouse the cases of whisky and stacked them, he counted them and told Porter he was 25 cases short; Porter and the other truck driver counted them as stacked and found the count correct; Porter apparently got mad when told he was 25 cases short and said he did not count it into his truck at Dallas. Porter did not ask him to check the cases of whisky in his truck by the billing, he would do that anyway. Porter did not ask him to report the shortage to the Dallas office, "but that was my job and I would do it any way"; he did report it to the Dallas office around 6 o'clock that morning or a little later; the reason he did not report it sooner was because he could not get the proper man on the line at Dallas. There is some additional matter testified to by this witness pertaining to when he reported the shortage to the local peace officers, but we think it immaterial to this appeal.

We note the material conflicts in the testimony of Porter, a witness for plaintiff, and that of Curry, a witness for defendant, concerning the means employed to unload and count the cases of whisky when unloaded into the warehouse at Kilgore.

It is axiomatic that in all cases tried to a jury, the jury has the responsibility of passing upon the credibility of the witnesses and the weight to be given their respective testimony.

Where the evidence is conflicting and the jury verdict reflects that the greater weight and credibility have been given to one contention than the other, courts will look to the probative value of the testimony accepted by the jury and if found to have legal merit, the verdict will be upheld.

It is undoubtedly true that in such cases as this, the ultimate fact of theft of the commodity may be proved by circumstantial evidence. The soundness of defendant's contention to the effect that the evidence in this case was not sufficient to support the jury verdict is dependent upon the application of the rule laid down for the establishment of a given fact by circumstantial evidence.

The accepted rule applicable to circumstantial evidence is set out in 17 Texas Jurisprudence 908, Section 409, in this language: "To establish a fact by circumstantial evidence, the circumstances relied on must have probative force sufficient to constitute the basis of a legal inference; it is not enough that they raise a mere surmise or suspicion of the existence of the fact or permit of a purely speculative conclusion. The circumstances relied on must be of such a character as to be reasonably satisfactory and convincing, or, as it has been said, sufficient reasonably to produce belief of the existence of the fact which is sought to be shown by them. At all events they must not be equally consistent with the nonexistence of the ultimate fact."

Jurors may accept some parts of a witness' testimony and reject other parts, when the testimony given is inconsistent, contradictory, contrary to established phys-

ical facts, or from the manner and demeanor of the witness creating a doubt of its truthfulness, or because of the interest the witness has in the fact sought to be established or discloses a prejudice or bias on his part prompting what he has said. In such instances the jury may form its verdict upon that part accepted along with any other testimony of probative value tending to support the same fact. Notwithstanding these general rules, the jury may not arbitrarily or capriciously reject the unimpeached and uncontradicted testimony of a disinterested witness. It is the settled rule that in passing upon the credibility of a witness and the weight to be given his testimony, the jury may consider his interest, if any, in the matter sought to be established. Gray v. Allen, Tex.Civ.App., 269 S.W. 510, writ dismissed; Galveston, H. & S. A. Ry. Co. v. Murray, Tex.Civ.App., 99 S.W. 144, writ refused; Young v. Blain, Com.App., 245 S.W. 65; Austin Fire Ins. Co. v. Adams-Childers Co., Com.App., 246 S.W. 365; Amer. Indemnity Co. v. Red River Natl. Bank, 132 S.W.2d 473, 481, writ dismissed, judgment correct.

It must be conceded that since all the witnesses who testified in this case were implicated in handling the whisky that was lost, they were each directly interested in making it clear that no culpatory act in connection with it could be attributable to him. It is as certain as human testimony can reveal that 84 cases of whisky were received by them for plaintiff who was legally bound to transport it to the consignees at Kilgore; this he did not do. It is equally certain that while the commodity consisted of "spirits", it, along with its containers, did not just disappear without the aid of human hands.

The same quantum of proof in an action like this is not required as in a criminal prosecution for theft. Plaintiff was not required to prove just when nor by whom the whisky was stolen. Corporation of Royal Exchange Assurance of London, v. Puckett, Tex.Civ.App., 246 S.W. 705. In Northern Assurance Co. v. Gross, Tex. Civ.App., 1 S.W.2d 369, writ refused, it was held that where the policy sued on provided that liability would only attach where

property was stolen by some one other than a member of insured's household, a preponderance of the testimony only would establish the condition.

In its brief, defendant argues, with respect to the rule above pointed out relating to circumstantial evidence, that the circumstances in this case are just as consistent with other means by which the whisky could have been lost as it is that a theft was committed. It instances: (1) That it could have been shipped from Dallas to some other point than Kilgore; (2) that the tailgate of the truck was improperly fastened and it came open and the whisky cases fell out on the road somewhere en route, and (3) that the 25 cases of whisky were loaded onto a truck at Dallas other than that driven by Porter. We see no merit in these contentions, since the testimony so clearly reveals the contrary in each instance mentioned.

Defendant cites and relies upon the holdings in such cases as Fireman's Ins. Co. v. Universal Credit Co., Tex.Civ.App., 85 S.W.2d 1061, and Savin Express Co. v. Hanover Fire Ins. Co., 132 Conn. 181, 43 A.2d 69, in support of its contention that the testimony in this case does not support the jury verdict of theft. We have observed the nature and extent of the testimony offered in those cases, and in neither are the facts and circumstances proven to establish theft, comparable with the testimony in this case. In the Texas case cited it appears that the only substantial testimony offered by plaintiff to show theft of his insured car was that the wrecked car had been found in front of another man's place of business before it had been reported as lost. Certainly without additional evidence a jury would not be authorized to find the car had been stolen. In the Connecticut case, it seems that the testimony relied upon to support theft consisted of the fact that a carrier received two packages for delivery at destination and had only delivered one of them. Much more than this was shown in the instant case as will be noted by our all too long statement of the evidence.

We believe and so hold that the testimony in this case, although circumstantial, was much more than what has been termed by

the courts a "scintilla"; and that it was sufficient to raise more than a mere surmise or conjecture that a theft had been committed. As stated by one of our courts in a somewhat similar case: "A reasonable connection between the established facts and the loss itself is fairly shown." We conclude that the holdings in the following cases support our expressed conclusions: Great Eastern Casualty Co. v. Boli, Tex. Civ.App., Amarillo, 187 S.W. 686; National Surety Co. v. Murphy, Tex.Civ.App., 215 S.W. 461; Corporation of Royal Exchange Assurance of London v. Puckett, Tex.Civ. App., 246 S.W. 705. Cases in other jurisdictions cited by both plaintiff and defendant do not appear to be in harmony with each other.

For the reasons herein stated and under the authorities cited, we overrule defendant's points of error and affirm the judgment of the trial court. Affirmed.