Jesus ROMERO, Jr., aka Jesse
Romero, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 69509.

Court of Criminal Appeals of Texas,
En Banc.

Sept. 17, 1986.

Jon R. Wood, Brownsville, for appellant.

Benjamin Euresti, Jr., Dist. Atty. and Mervyn M. Mosbacker, Jr., Asst. Dist. Atty., Brownsville, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A. Penal Code, Sec. 19.03(a)(2). After finding appellant guilty, the jury returned affirmative findings to the special issues under Art. 37.071, V.A.C.C.P. Punishment was assessed at death.

The indictment charges in pertinent part that appellant on or about the 23rd day of December, 1984, did unlawfully:

"... intentionally and knowingly cause the death of O___ P___, the deceased, by striking her on the head and face with a blunt object, the nature of which is unknown to the grand jury, and the said defendant was then and there in the course of committing and attempting to commit the offense of aggravated sexual assault on O___ P___ in violation of the penal laws of this state, to wit: Section 19.03(a)(2) of the Texas Penal Code, ..."

In a single ground of error appellant contends "The accomplice witness testimony is not independently corroborated concerning the appellant's involvement in the commission of the offense as to that element which elevates the murder to capital murder."

Appellant urges that "no independent evidence exists, either real or circumstantial connecting him to the aggravating element necessary to sustain a capital murder con-

viction if the accomplice testimony is disregarded." The cases cited by appellant, *Fortenberry v. State,* 579 S.W.2d 482 (Tex. Cr.App.1979) and *County v. State,* 668 S.W.2d 708 (Tex.Cr.App.1984) stand for the proposition, as urged by appellant, that the accomplice witness testimony has to be corroborated as to the specific element which makes the offense a capital crime. However, since appellant's brief was prepared, *Fortenberry* and its progeny have been expressly overruled by this Court in *Holladay v. State,* 709 S.W.2d 194 (Tex.Cr.App. 1986). *Holladay* held that the testimony of an accomplice witness in the prosecution for capital murder did not require corroboration concerning the alleged robbery (the offense which elevated murder to capital murder) as well as the alleged murder.

Art. 38.14, V.A.C.C.P., provides:

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."

A review of the court's charge in the instant cause reflects that it is in conformity with Art. 38.14, supra and sets forth all the requirements for corroboration of an accomplice witness' testimony outlined in *Holladay.*

Notwithstanding the demise of *Fortenberry* we review the sufficiency of the evidence to support the conviction. We make such review due to the seriousness of the offense for which appellant was convicted and especially in light of the severity of the punishment assessed.

Appellant, along with Jose Cardenas, Davis Losada and Rafael Leyva were indicted for the offense of capital murder of the victim, a fifteen-year-old junior high student in San Benito. Said offense was alleged to have occurred on December 13, 1984.

Codefendant Leyva, who was sixteen years of age at the time, went to his juvenile probation officer on January 8, 1985

and reported the instant offense. Texas Ranger Bruce Casteel, District Attorney Alvarado and an attorney for Leyva, Horacio Berrera (who continued to represent Leyva) were summoned. Leyva made a statement at that time about the offense in which he admitted his presence at the offense but denied any other involvement.

At trial Leyva testified in behalf of the State. The testimony of Leyva at trial reflected the following. A party, which was attended by the deceased, was held at Ray Amaya's house in San Benito on the night in question. Cardenas, Losada and appellant approached Leyva in downtown San Benito in Cardenas' car and invited him to go to a party with them. Prior to arrival at Amaya's house they went "cruising" for about an hour during which time all of them were drinking beer and smoking marihuana. Upon arrival at Amaya's house it was discovered that the party had broken up and only Amaya and the deceased were present. The deceased came out and "started going to the car slowly ... all of a sudden Jesse Romero [appellant] pushed the girl [the deceased] inside the car." Cardenas was in the driver's seat and appellant pushed the deceased into the passenger side of the front seat. Losada and Leyva got in the back seat. "Jesse [appellant] was holding the girl's head down ... He was holding it with the right hand on her head pushing to her knees ... he was telling her just to keep quiet." The testimony of Leyva reflects that they drove to a place beside the lake called La Piedra. During that time appellant was holding the deceased's head down and telling her to be quiet. The deceased was asking to "leave her alone" and "take her home." Davis Losada first had sex with the deceased. Davis put "a knife to her neck ... and she got on 'four' giving Davis a blow job ... the girl was saying to take her home and just to leave her alone and Davis was telling her to shut up and if she didn't shut up something was going to happen to her, and the girl was kind of like weeping ..."

Appellant "unzipped his pants and got inside the car while the girl was on 'four,' and still gave Davis the blow job, he [appel-lant] got in through the back and started having sex with her." After appellant finished, Leyva "started having sex with her in the back." The deceased was subsequently ordered out of the car by Losada and forced to get on the "back windshield" where Losada "started having sex with her again." The deceased continued to ask to be taken home and Cardenas removed a pipe from the car that "looked like a baseball bat." A discussion ensued as to whether the deceased would tell anyone and the deceased insisted that she would keep quiet and say nothing. Leyva testi-fied that he told the others that she would keep quiet and they keep telling him "That's no good. She's going to say some-thing and we are going to get in trouble." Cardenas handed Leyva the pipe and Leyva hit the girl on the forehead with the pipe. The deceased did not fall down and appel-lant grabbed the pipe out of Leyva's hand and "Started hitting the girl ... He was hitting her hard with both hands on the pipe." The deceased fell to the ground after appellant hit her the second time and after she fell to the ground appellant hit her "three or four or five times at the most." The girl stopped making noise af-ter appellant "finished hitting her." Some-one else hit her "three or four more times." Leyva then observed Cardenas hitting the girl "with both hands on the pipe." Jesse [appellant] was giggling while he was hit-ting the girl." Losada told Leyva to "grab the girl and drag her inside the bushes." Leyva responded that he was not going to grab the girl. Losada and appellant "both came at me with knives." Appellant then observed the girl move and Losada said "Just to make sure she's dead, I'll stab her." Losada again told Leyva to drag the girl into the bushes and after dragging her "halfway," Davis told appellant "to give me a hand" and "my and Jesse [appellant] dragged the girl way back in the bushes." Appellant with a knife in his hand told Leyva "Stab her or I'll stab you." Leyva stabbed the girl "from the waist to her chest" and gave the knife back to appel-lant. Leyva and his three companions re-

turned to the car and they left the scene and Losada said, "We all did it, you know. Everybody had a part in it." Losada threw the knife "into some canal." Appellant then handed his knife to Losada so he could throw it out. Cardenas stopped on a bridge and Losada threw the girl's clothes out. Leyva was instructed by Losada to not tell anyone that they were together. The remaining three were going to say "all we know is that we dropped the girl off at the Azteca." Losada warned Leyva "Just keep your mouth shut and if you don't the same thing is going to happen to you."

Appellant made a written confession, the following portions of which were admitted into evidence.

Omitting the warning and formal parts, the confession recites:

"The party started to break up around 11:00 or 11:30 P.M. We left in Joe's [Cardenas] car. Joe was driving. Davis [Losada] and Rafa [Leyva] were in the back seat. We drove out to what is known as La Piedra and drove down a narrow road from a bigger road for approximately one city block in distance. Davis, with the knife in one hand, forced [deceased] to make out with him, Rafa made out with her, then Joe made out with her. Davis got a pipe and started hitting [deceased] about the head. Rafa hit her also. Joe did hit her. Afterwards, [deceased] was laying there and Davis stabbed her. After Davis stabbed her Rafa got a hold of one leg and I got a hold of the other leg and we pulled her into the bushes. I don't know what happened to the pipe and didn't see it anymore when we left the area.

"When we left the area Joe was driving. Rafa and I were in the back seat, and Davis was in the front passenger side. As we traveled down a dirt road, Davis got rid of the knife that was used to stab [deceased] and also got rid of another knife. He did this by throwing the knives out the window. We then traveled some more and we then stopped on a small bridge that goes over a drainage ditch there by the overpass that is close

to the Valley Buick Company located just southeast of San Benito. When we stopped there Davis gave Rafa some other items and Rafa threw those out in the drainage ditch also.

"Rafa was dropped off first by the Bertha Cavazos School.

"I have been shown two photos by Investigator Joe Alvarado of the District Attorney's Office and I have identified both pictures as being #1, that of [deceased], the way we left her that night there in the bushes. Photo #2 is the way we left [deceased] after Rafa and I dragged her into the bushes. I have initialed, dated, and placed the time on both photos."

A search of appellant's residence resulted in the recovery of a man's "blooded underwear" at the bottom of a garbage bag. Raul Guajardo, a chemist with the Department of Public Safety, testified his analysis revealed that human blood was on the sides of the underwear. The findings were consistent with either Type A or Type AB. Blood samples from the deceased and appellant were both type A. Blood samples of the three codefendants showed all of them to be type O.

■ Proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction. *Brown v. State*, 672 S.W.2d 487 (Tex.Cr.App.1984); *Passmore v. State*, 617 S.W.2d 682 (Tex.Cr.App.1981).

In *Jackson v. State*, 516 S.W.2d 167 (Tex. Cr.App.1974) in an appeal from a murder conviction, we held:

"It is well established that ... admissions or confessions, under most circumstances, will be sufficient to corroborate the accomplice witness. We reject any contention that appellant's testimony must be excluded in ascertaining the sufficiency of the evidence to corroborate the accomplice witness because he testified he acted in self-defense."

In *Graham v. State*, 643 S.W.2d 920 (Tex.Cr.App.1981), in an appeal from a conviction for capital murder, we held that there was sufficient evidence to corroborate the accomplice witness where defendant was placed at the scene of the crime close to the time the offense occurred and another witness saw a man from behind who looked like "the accused leaving the building where the crime occurred shortly after it happened."

In order to support a conviction based upon an accomplice witness' testimony, there must be corroborating evidence, other than the testimony of the accomplice witness which tends to connect the defendant with the offense. Art. 38.14, supra, *Hardesty v. State*, 656 S.W.2d 73 (Tex.Cr. App.1983), *Graham v. State*, supra, *Brown v. State*, 657 S.W.2d 117 (Tex.Cr.App.1983).

It is not necessary that the evidence corroborating the accomplice witness testimony directly link the accused to the crime or be sufficient in itself to establish guilt. It is sufficient if the combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses tends to connect the accused with the commission of the offense. *Granger v. State*, 683 S.W.2d 387 (Tex.Cr.App.1984).

The statement given by appellant corroborates the testimony of Leyva in that it places the appellant with the codefendants before, during and after the sexual assaults upon and murder of the deceased. The statement recites details such as the place where the deceased first appeared, the scene of the crime, the hitting and stabbing of the deceased, the location of the place where the body of the deceased was dragged, the departure from the scene and disposal of the knife and other items. The statement further corroborates the testimony of Leyva in that appellant admits therein that he and Leyva dragged the deceased into the bushes.

We find that the appellant's statement contained evidence which tended to connect appellant with the crime. In addition, the underwear recovered from appel-

lant's residence determined to have blood stains consistent with appellant and deceased's blood type is a circumstance which may be considered. The corroboration was sufficient. The evidence supports the conviction.

Even when we employ the now rejected standard of *Fortenberry* we find the corroboration sufficient and the evidence ample to support the convictions.

The judgment is affirmed.

CLINTON, J., concurs in the result.