

NUMBER 13-05-714-CR

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG

SHERRY LYNN SMITH,                                                      Appellant,

v.

THE STATE OF TEXAS,                                                    Appellee.

On appeal from the 278th District Court
of Grimes County, Texas

DISSENTING OPINION

Before Justices Yañez, Benavides, and Vela
Dissenting Opinion by Justice Vela

I respectfully dissent. Appellant, Sherry Lynn Smith, argues the non-accomplice evidence did not constitute evidence tending to connect her with the commission of the offense. The majority agrees, holding "the non-accomplice testimony in this case does not adequately connect Sherry to the crime." Slip op. at 2. Because I believe the record

contains more than some non-accomplice evidence that tends to connect Sherry to the commission of the offense alleged in the indictment, I would overrule this issue, and I would not render a judgment of acquittal.

## I. Standard of Review

Accomplice-witness testimony cannot support a conviction unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense. *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007). When applying this rule, a reviewing court excludes all of the accomplice-witness testimony from consideration and then examines the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime. *Id.* (citing *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). We have said that "[t]he tends-to-connect standard presents a low hurdle for the State." *Patterson v. State*, 204 S.W.2d 852, 858 (Tex. App.–Corpus Christi 2006, pet. ref'd); *see Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996); *Munoz v. State*, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993). The court of criminal appeals has said that "[t]he non-accomplice evidence does not have to directly link [the defendant] to the crime, nor does it alone have to establish his guilt beyond a reasonable doubt." *Id.* (quoting *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997)). There simply needs to be other evidence tending to connect the defendant to the offense. *Id.* Further, the court of criminal appeals has noted that "unlike extrajudicial confessions, testimony of an accomplice need be corroborated only as to facts 'tending to connect the defendant with the offense committed' and not as to the corpus delicti[1] itself."

---

[1]The corpus delicti of murder is established if the evidence shows the death of a human being caused by the criminal act of another. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).

2

*Id.* (quoting *Gribble v. State*, 808 S.W.2d 65, 71 n.13 (Tex. Crim. App. 1990).

Evidence corroborating the accomplice-witness testimony is sufficient if the combined cumulative weight of the incriminating evidence furnished by the non-accomplice witnesses tends to connect the accused with the commission of the offense. *Romero v. State*, 716 S.W.2d 519, 523 (Tex. Crim. App. 1986). All facts and circumstances in evidence may be looked to as furnishing the necessary corroboration. *Mitchell v. State*, 650 S.W.2d 801, 807 (Tex. Crim. App. 1983). Sometimes, insignificant circumstances afford the most satisfactory evidence of guilt and corroboration of the accomplice-witness's testimony. *Id.* In applying the test of the sufficiency of the corroboration, each case must be considered on its own facts and circumstances. *Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988).

Independent evidence that generally tends to prove that an accomplice witness's version of events is true, rather than the defendant's version, is considered corroborative, even if it concerns a mere "detail," as opposed to a substantive link between the defendant and commission of the offense. *Beathard v. State*, 767 S.W.2d 423, 430 (Tex. Crim. App. 1989). The corroborating evidence may be either circumstantial or direct. *Reed*, 744 S.W.2d at 126; *Granger v. State*, 683 S.W.2d 387, 392 (Tex. Crim. App. 1984).

## II. The Non-Accomplice Evidence

Sherry Lynn Smith ("Sherry") was the former wife of Daniel "Boone" Gardner. From this relationship, Sherry and Boone had a daughter, Tori, who at the time of the murders had the name Tori Sword. After Sherry and Boone divorced, Sherry married Carey Smith. Sherry and Carey lived with Carey's father, Charles Smith, who was in poor health.

At approximately 4:30 p.m. on December 7, 2002, Sherry told a 911 dispatcher that Carey and Charles were dead. Authorities went to the Smith home and found Carey and

3

Charles in bed in their respective bedrooms. Both were shot and killed with a high-powered rifle. There was no evidence of a murder suicide.

*A. Sherry's Deteriorating Relationship with Carey and Charles*

Tori Sword testified that Sherry was "frustrated" and "wasn't very happy" with Carey and Charles. Sherry did not like the fact that Carey and Charles were keeping tabs on her. Tori stated that when Carey called Tori's house looking for Sherry, Sherry "talked kind of ugly" to him. On one occasion, Sherry talked about leaving Carey.

Jerry Simcik, a home health care nurse, testified about the relationship between Sherry and Charles. Simcik stated that "there was a lot of tension," "a lot of stress in the household," and that Sherry "would get irritated with Charles."

Teresa Knott, who attended the same church as Charles, testified that caring for Charles became stressful for Sherry as Charles's needs grew.

*B. Sherry's Rights to Carey and Charles's Property*

Attorney Fred Neal testified that in 2001 (the year before the murders), he prepared Carey's will, which left all of Carey's property to Sherry and made her his executor. Years earlier, he prepared Charles's will, which left everything to Charles's wife. Because Charles's wife had predeceased him, the will provided that Carey would receive the Smith residence. Neal testified that because Charles and Carey died about the same time, Carey would not inherit anything from Charles. However, a very important fact is that Neal opined that to a lay person, the wills indicate that if Charles died, his property would pass to Carey, and if Carey died, the property would pass to Sherry.

Thus, to a lay person like Sherry, the wills indicated both Carey and Charles would have to die for Sherry to inherit the Smith residence.

4

*C. Sherry's Statements about the Future Deaths of Carey and Charles and Her Perception about Her Right to the Smith Residence*

Debra Cargill, a home respiratory therapist, visited the Smith home prior to the murders. Cargill testified that during this visit, she commented to Sherry how nice the place looked. In reply, Sherry stated that, "[O]ne day this would be hers [Sherry's]."

Tori testified that before the murders, Sherry told her that Charles, who was in poor health and occasionally went to the hospital, "wasn't going to live much longer." Sherry also told her that when Charles died, Carey would not live much longer and that "everything would be hers."

*D. Sherry's Relationship with Boone*

At some point prior to the murders, Sherry and Boone rekindled their relationship. Tori testified that when Boone first started staying with Tori, Sherry stayed away from Tori's house. After some time, Sherry started to come to Tori's house more frequently. Tori testified that later on, Sherry always wanted to be where Boone was and that Sherry wanted to talk to him and follow him around. Sherry craved Boone's attention. Tori testified that on one occasion, Sherry told her that she had kissed Boone and that she still loved him.

*E. Sherry's Financial Condition*

The State introduced into evidence tape-recorded statements in which Sherry admitted to having several credit cards that Carey did not know about. The credit-card debt totaled over $42,000, and Sherry was behind on the payments. In an interview with Officer Martinez and Ranger Wells, conducted four days after the murders, Sherry admitted that the debt was hers and that Carey did not know about it. Prior to this interview, the officers had learned that Sherry had credit-card debt in Carey's name.

5

*F. Sherry's Opportunity to Murder Carey and Charles and Her Prior Knowledge of Their Deaths*

Tori testified that on December 6, 2002, she was working at a Diamond Shamrock from 4:00 p.m. until the early morning of December 7 (the day Sherry called 911 to report the deaths of Carey and Charles.). While Tori was at work, Sherry was at the Smith home, babysitting Tori's son, Logan. Tori left work at 12:45 a.m., December 7. At some point, Sherry called Tori to ask where she was and was mad because she (Sherry) had to leave early in the morning to go to Huntsville. Tori testified it was unusual for Sherry to be angry about Tori being late. When Tori arrived at the Smith home about 1:00 a.m., Sherry brought Logan to Tori's vehicle. Tori testified that when Sherry brought Logan to the vehicle, Sherry was wearing a house coat. Tori stated the house coat "was something [Sherry] normally wore." However, after the murders, Tori never saw the house coat again. When Tori and Logan returned home, Boone was there.

*G. Sherry and Boone's Behavior After the Murders*

Tori testified that Sherry's reaction to the murders was not typical of someone who was grieving. Rather than asking Tori to cooperate with the police, Tori testified that Sherry and Boone "actually told me that I didn't have to" talk to the police and that "[a]nything that I say can incriminate my mom [Sherry]." Tori stated that Boone was concerned that Tori would say something to incriminate Sherry. In March 2003, Sherry and Boone were both arrested for the murders. While Sherry was in jail, Sherry told Tori she still loved Boone.

*H. Sherry's Interview at the Murder Scene*

On December 7, Deputy Schroeder interviewed Sherry at the murder scene. Sherry mentioned guns in the house but discussed them in the past tense. Deputy Schroeder testified she never told Sherry any guns were missing from the house.

6

*I. Sherry's Interview with Officer Martinez and Ranger Wells*

About five hours after Sherry called 911 to report the deaths of Carey and Charles, she told Officer Martinez and Ranger Wells that on December 6 (the night before she reported the deaths), she had been at the Smith home, babysitting Logan. Tori picked up Logan at roughly 12:30 a.m. on December 7, and Sherry went to bed at 1:00 a.m. Three hours later, she left home to go to a Wal-Mart store in Huntsville. She said that Carey and Charles were asleep when she left. Sherry showed up at the Wal-Mart parking lot at 5:15 a.m. and stayed at the Wal-Mart until 6:42 a.m. At approximately 7:30 a.m., she arrived at a friend's house in Houston. She and the friend went to Humble to visit Sherry's cousin, who was in the hospital. Sherry left the hospital at 1:00 p.m., and after buying a cell phone in Huntsville, she went to the Diamond Shamrock where Tori worked. Sherry and Boone were at this Diamond Shamrock at approximately 4:00 p.m. Sherry said she went there to pick up Logan so she could babysit him while Tori worked. After leaving the Diamond Shamrock with Logan, she went to Tori's home to pick up Logan's medicine. Boone was at Tori's house. Sherry then went to the Smith home.

Sherry's reaction, or lack thereof, to finding her husband and Charles is suspicious and incriminating. She told Officer Martinez and Ranger Wells that when she entered her husband's bedroom, she saw him in bed with blood coming out of his nose. She did not tell Officer Martinez or Ranger Wells that she saw blood any where else in this bedroom. Instead of shaking her husband to see if he was still sleeping or asking him if he knew he had a nose bleed, she flippantly left his bedroom and closed the door. She did not even bother to call paramedics so they could check on her husband's condition. Instead, for reasons unknown, she went to Charles's bedroom. She told Officer Martinez and Ranger Wells that as she approached Charles, she believed he was dead. She offered no

7

explanation to them about how, as she approached Charles, she believed he was dead and not asleep as she had left him earlier that morning. She did not tell Officer Martinez or Ranger Wells whether she tried to see if Charles was still asleep, call out to him, check if he was breathing, or check for a pulse. Moreover, she did not tell them she saw blood in Charles's bedroom.

Yet, at 4:30 p.m. on December 7, Sherry told the 911 dispatcher that Carey and Charles were dead. She did not tell the dispatcher how or by what means she knew they had died. And, based upon what she told Officer Martinez and Ranger Wells, Sherry could not have concluded that Carey and Charles were dead unless she had knowledge of their deaths before she returned to the Smith home that afternoon.

The evidence is undisputed that after Tori picked up Logan from the Smith home about 1:00 a.m. on December 7, Sherry was alone with Carey and Charles from that time until the time she left the Smith home early that morning to go to Wal-Mart—a time span of at least three hours. During this three-hour period, Sherry had ample time to murder them while they slept and remove the guns, including the murder weapon, from the house. The logical conclusion is that Sherry's departure from the Smith home at 4:00 a.m. to go to Wal-Mart, visit a friend, visit a hospitalized cousin, buy a cell phone, go to the Diamond Shamrock, go to Tori's home to pick up Logan's medicine, and then return home at 4:30 p.m. was an attempt to establish an alibi. She did not tell Officer Martinez or Ranger Wells that she had left a note for Carey and Charles, telling them she would be gone most of the day, or that she had made any effort to contact them to tell them where she was.

*J. Sherry's Knowledge of the Guns*

During Sherry's initial interview with Officer Martinez and Ranger Wells, the officers asked her what guns might have been present at the Smith home. Sherry described

8

several guns, including one that was in a black gun case in the utility room. When Officer Martinez told her there was no black gun case found at the Smith home, Sherry stated, "The guns are gone, aren't they?"

*K. The Probable Murder Weapon*

Ray Cooper, a firearms examiner, tested the bullets recovered from the murder victims and compared those bullets to guns recovered from Boone. Even though damage to the recovered bullets prevented Cooper from positively saying which gun had fired the recovered bullets, he opined that the recovered bullets had the same general characteristics as the 25.06 rifle recovered from Boone and that the recovered bullets could have come from the 25.06 rifle.

*L. Sherry's Demeanor During Her Initial Interview with Officer Martinez and Ranger Wells and the Stain on Her Clothes*

Sherry's demeanor during her interview with Officer Martinez and Ranger Wells is not consistent with someone who had only five hours earlier reported the deaths of their husband and father-in-law. Ranger Wells testified that during the interview, Sherry did not cry, but occasionally laughed. At the end of the interview, she agreed to turn over the clothes she was wearing that day to Officer Martinez for testing.

Staci Dennison, a forensic biologist, tested the clothes that Sherry was wearing on the day of the murders. The presumptive test, which she performed on the outside of Sherry's pant leg, tested positive for traces of blood. A presumptive positive for blood means that the substance could be blood but it is not conclusive. Another forensic biologist, Kenneth Balagot, performed a DNA test on the substance found on the outside of Sherry's pant leg. He testified that the DNA from that sample was a mixture of two contributors that could be divided into a major and minor contributor. He stated that the

9

set of genetic markers from the major contributor matched Sherry's DNA profile and that the minor contributor's profile "corresponded" to genetic markers observed in Carey's DNA profile. He testified that there was a 1 in 195 chance that Carey was a contributor to the DNA.

## III. Analysis

The evidence independent of that of the accomplice witness revealed the murders of Carey and Charles by someone. Evidence showing the commission of the offense charged is a factor to be considered along with other possible factors in determining whether there is sufficient independent evidence to corroborate the accomplice-witness testimony. *Paulus v. State*, 633 S.W.2d 827, 844 (Tex. Crim. App. 1982). Sherry was in Boone's presence on numerous occasions before the murders, on the day of the murders, and after the murders. The presence of the accused with the accomplice witness, when coupled with other circumstances, may be sufficient corroboration. *Dillard v. State*, 550 S.W.2d 45, 51 (Tex. Crim. App. 1977); *Nelson v. State*, 542 S.W.2d 175, 177 (Tex. Crim. App. 1976). The evidence showed Sherry had incurred $42,000 in credit-card debt without Carey's knowledge; that she harbored ill will towards Carey and Charles; that she talked about leaving Carey; that she was in love with Boone; and that to a lay person, she stood to inherit the Smith residence if Carey and Charles died. Even though evidence which *merely* goes to show motive or opportunity of the accused to commit the crime is insufficient alone to corroborate the accomplice-witness testimony, it may, however, be considered in connection with other evidence tending to connect the accused with the crime. *Reed,* 744 S.W.2d at 127. Accordingly, this evidence may be considered in connection with all other evidence tending to connect Sherry to the murder of her husband and father-in-law. *See id*. (evidence of an affair may be considered in connection with

other evidence tending to connect defendant to his wife's murder); *see also Richardson v. State*, 879 S.W.2d 874, 880 (Tex. Crim. App. 1993) (ill will toward victim is suspicious circumstance that tends to connect accused to the crime in order to furnish sufficient corroboration to support conviction); *Paulus*, 633 S.W.2d at 844 (motive is a factor to be considered along with other possible factors in determining whether there is sufficient independent evidence to corroborate the accomplice witness).

In *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984), the court stated, "Proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." Sherry's interview with Officer Martinez and Ranger Wells showed that after Tori picked up Logan, Sherry was alone with Carey and Charles for at least three hours before she left home to go to Wal-Mart. Sherry said that when she left to go to Wal-Mart, Carey and Charles were asleep. Both victims were found shot to death in their beds; the logical conclusion is they were killed while they slept. Thus, Sherry placed herself at the crime scene relative to the time of the murders.

With respect to the stain on the clothes Sherry was wearing about five hours after she reported the murders, the set of genetic markers from the major contributor matched Sherry's DNA profile, and the minor contributor's profile "corresponded" to genetic markers observed in Carey's DNA profile. This is a circumstance that tends to connect Sherry to the offense. *See Gosch v. State*, 829 S.W.2d 775, 781 (Tex. Crim. App. 1991) (blood of victim's blood type found on defendant's blue jeans was some evidence tending to connect defendant to the offense); *Romero,* 716 S.W.2d at 523 (underwear recovered from defendant's residence determined to have blood stains consistent with defendant and

11

deceased's blood type is a circumstance which may be considered when determining corroboration of accomplice-witness testimony).

Sherry's behavior upon seeing Carey and Charles in their beds when she returned home on December 7 indicates she had prior knowledge of their deaths. This is a suspicious circumstance that tends to connect the accused to the crime in order to furnish sufficient corroboration to support a conviction. *See Reed,* 744 S.W.2d at 127;[2] *see also Thompson v. State*, 54 S.W.3d 88, 94 (Tex. App.–Tyler 2001, pet. ref'd) (defendant's extra-judicial confession can corroborate accomplice's testimony that defendant committed the offense). The logical conclusion from Sherry's conduct on the day of the murder—leaving the Smith home at 4:00 a.m. and not returning until about 4:30 p.m.—is that she was trying to establish an alibi. This is a suspicious circumstance because it suggests the existence and implementation of a plan and, therefor, tends to corroborate Boone's testimony that Sherry had planned to murder Carey and Charles. *See Beathard*, 767 S.W.2d at 430 (suspicious alibi is a factor tending to connect defendant to the offense).

On the day of the murders, when Tori picked up Logan, Sherry was wearing a house coat that she normally wore. Tori described the house coat as a pale, cotton or terry cloth robe. After the murders, Tori never saw that house coat again. This is a suspicious

---

[2]In *Reed*, the accomplice witness testified the defendant had pushed the deceased's body out of the car "face first" onto the side of the highway. *Reed v. State*, 744 S.W.2d 112, 127 (Tex. Crim. App. 1988). When police took the defendant to the scene along the highway, the defendant got within six or seven feet of the body on the side of the highway, glanced down, and immediately identified the body as that of his wife. *Id*. The deceased's face was turned away from the defendant's position and was not otherwise visible because of hair and the clothing being pushed up. *Id*. at 127-28. A police officer, who was at the scene, opined that the defendant could not have seen the deceased's face. *Id*. at 128. Another police officer who saw the defendant identify the deceased, stated that from the defendant's position, a person could not tell if the body was male or female, see the face, or tell who it was. *Id*. The court of criminal appeals viewed this evidence as a circumstance furnishing the necessary corroboration. *Id*.

In the case before this Court, the accomplice, Boone, testified that Sherry told him she had killed Carey and Charles. In her statement to Officer Martinez and Ranger Wells, Sherry did not indicate how, after seeing Carey and Charles in bed, she knew they were dead, unless she had prior knowledge of their deaths. Thus, like the situation in *Reed*, we can consider this evidence as a circumstance furnishing the necessary corroboration of Boone's testimony that Sherry had killed Carey and Charles.

12

circumstance tending to connect Sherry to the murders because it corroborates Boone's testimony that: (1) two days before the murders, Sherry told Boone that she had some guns and that Boone told her to put them on his utility trailer; (2) at roughly 4:30 a.m. the morning of the murders, Boone heard a vehicle drive up to Tori's house; (3) later that morning, Boone discovered guns on his trailer; and (4) one of the guns was wrapped in a pale blue colored, terry-cloth bath robe. Tori's testimony represents corroboration of a detail that tends to connect Sherry to the offense. *See Beathard*, 767 S.W.2d at 431.[3]

In addition, Sherry knew about and had access to the guns in the Smith home. A comparison of the bullets recovered from the murder victims to those bullets from the guns recovered from Boone showed that the recovered bullets had the same general characteristics as the 25.06 rifle recovered from the accomplice, Boone, and that the recovered bullets could have come from the 25.06 rifle. Non-accomplice evidence that a particular gun "may have been used in the commission of the crime" is a suspicious circumstance that tends to connect the accused to the crime in order to furnish sufficient corroboration to support a conviction. *Richardson,* 879 S.W.2d at 880.

With respect to the murder weapon, Boone testified that the gun wrapped in the bath robe was a "25.06" with two spent hulls inside it. Thus, the ballistics evidence represents corroboration of a detail that tends to connect Sherry to the commission of the offense. *See Beathard*, 767 S.W.2d at 430 (independent evidence that generally tends to prove that an accomplice witness's version of events is true, rather than defendant's

---

[3]In *Beathard*, the defendant argued on appeal there was insufficient evidence to corroborate the testimony of the accomplice, Gene Hathorn. *Beathard v. State*, 767 S.W.2d 423, 427 (Tex. Crim. App. 1989). Hathorn testified the defendant was wearing overalls, a t-shirt, and a pair of tennis shoes. *Id*. at 431. He stated the defendant said that he intended to dispose of his shoes so that, in the event footprints were discovered at the crime scene, they could not be matched to his shoes. *Id*. Cathy Ross, a non-accomplice witness, confirmed Hathorn's description of the defendant's dress and said that since the day of the murder, she had never again seen these articles of clothing. *Id*. The court of criminal appeals considered this corroborative of Hathorn's testimony. *Id*. at 430-31.

version is considered corroborative).

Given Sherry's admitted presence at the crime scene and the number of factors discussed above, I conclude the combined cumulative weight of the incriminating evidence furnished by the non-accomplice testimony tends to connect Sherry to the offense either as a principal or as a party. Therefore, I would hold the evidence is sufficient to corroborate Boone's testimony that Sherry murdered Carey and Charles. *See Beathard*, 767 S.W.2d at 431. For these reasons, I respectfully dissent.


ROSE VELA
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Dissenting Opinion delivered and
filed this 13th day of November, 2008.

14