ACCEPTED
13-14-00123-CR
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
9/18/2015 9:58:12 AM
Dorian E. Ramirez
CLERK

**Cause No. 13-14-00123-CR**

IN THE COURT OF APPEALS
FOR THE THIRTEENTH SUPREME JUDICIAL DISTRICT
AT CORPUS CHRISTI-EDINBURG, TEXAS

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
9/18/2015 9:58:12 AM
DORIAN E. RAMIREZ
Clerk

-------------------------------------------------------------------------------------

**RAUL LARA, APPELLANT**
**v.**
**THE STATE OF TEXAS, APPELLEE**

-------------------------------------------------------------------------------------

APPEAL OF TRIAL COURT CAUSE NO.  CR-4394-12-E
FROM THE 275TH DISTRICT COURT
HIDALGO COUNTY, TEXAS
The Honorable Juan Partida, Presiding

-------------------------------------------------------------------------------------

**BRIEF OF THE STATE OF TEXAS/APPELLEE**

-------------------------------------------------------------------------------------

Criminal District Attorney
Hidalgo County, Texas

Glenn W. Devino
State Bar No. 24012525
Lead Counsel for Appellee

Office of the Criminal District Attorney
100 N. Closner Blvd.
Edinburg TX 78539
Telephone 956-318-2300 ext. 808
Facsimile 956-380-0407

FOR THE STATE OF TEXAS, APPELLEE

# IDENTIFICATION OF PARTIES AND COUNSEL

Appellee certifies that the following is a complete list of the parties, attorneys, and all other interested persons regarding this matter:

**1.) The Appellant is:**
Raul Lara

**2.) Appellant was represented in the trial court by:**
Judith Pena-Morales, Esq.          120 S. 12th Ave., Edinburg TX 78539
E. Omar Maldonado, Esq. [1]          100 N. Closner, Edinburg TX 78539
O. Rene Flores, Esq.          1308 S. 10th St., Edinburg TX 78539

**3.) Appellant is represented on appeal by:**
Rolando Garza, Esq.          310 W. University Dr., Edinburg TX 78539

**4.) The Appellee is:**
The State of Texas
by and through Ricardo Rodriguez, Jr., Hidalgo County Criminal District Attorney

**5.) Appellee was represented in the trial court by:**
Rene Guerra, Criminal District Attorney in and for Hidalgo County, Texas[2]
100 N. Closner, 3rd floor, Edinburg TX 78539
by his Assistant Criminal District Attorneys Linda Castillo, Roberto 'Bobby' Lopez, Jr. and Ashley Reeve

**6.) Appellee is represented on appeal by:**
Ricardo Rodriguez, Jr., Criminal District Attorney in and for Hidalgo County, Texas
100 N. Closner, 3rd floor, Edinburg TX 78539
by his Assistant Criminal District Attorney Glenn W. Devino

---

[1] E. Omar Maldonado, Esq., now sits as Judge Presiding, County Court at Law 8, Hidalgo County, Texas; his motion to be permitted to withdraw as counsel for Appellant was granted by written order before trial on the merits or any proceedings pertinent to this appeal. O. Rene Flores, Esq. was granted leave to substitute for E. Omar Maldonado as co-counsel with Ms. Morales, who represented Appellant throughout the course of proceedings in the trial court. CR169, CR171, CR249.

[2] The term of office of Rene Guerra as Criminal District Attorney in and for Hidalgo County, Texas, ended after trial of this cause was concluded but during the pendency of this appeal.

## NOTES AS TO THE FORM OF CITATION

A.) Citation to the Clerk's Record will be to page number, *e.g.* CR 47 refers to Page 47 of the Clerk's Record. Citation to a Supplemental Clerk's Record will be to volume and page number, *e.g.* 1SCR5 refers to Page 5 of Supplemental Clerk's Record, volume 1.

B.) Citation to testimony in the Reporter's Record will be to volume and page number, *e.g.* 3RR56 refer to page 56 of volume 3 of the Reporter's Record.

*Note: The numbering of the various volumes of the Reporter's Record is in some respects improper:*

a.) *A reference to 17RR herein is a reference to the transcript memorializing proceedings conducted December 6, 2013; a reference to 1Supp. RR herein is a reference to the transcript memorializing proceedings conducted December 9, 2013.[3]*

b.) *A reference to 25RR herein is a reference to the transcript memorializing proceedings conducted December 18, 2013, although the copy of the transcript memorializing these proceedings, as provided by the District Clerk of Hidalgo County, is labeled 'volume 26 of 29'.*

c.) *A reference to 26RR herein is a reference to the transcript memorializing proceedings conducted December 19, 2013.*

d.) *A reference to Supp. RR1, followed by an exhibit number, is a reference to the Supplemental Reporters Record containing exhibits admitted in suppression hearing.*

---

[3] Both of these referenced volumes are numbered '7 of 29'; staff of the Court has advised that the latter volume will be and is redesignated so as to avoid confusion.

**TABLE OF CONTENTS**

Title Page…………………………………………………………………………...1

Identification of Parties and Counsel …...……………………………………….2

Note as to the Form of Citation……………………………...…………….....3

Table of Contents…………………………………………….…………….…..4

Index of Authorities…………………………………………………………...5

Statement of the Case……………………………………………………7

Issues Presented……………………………………………………………….9

Statement of Facts………………………………………………………...10

Summary of Arguments…………………………………………………......36

Note as to Oral Argument……………………………………………......37

Arguments and Authorities…………………………………………………..38

Issue One:      *The trial court did not reversibly err in putting to the jury the determination of whether two particular witnesses were accomplices*......………..38

Issue Two:      *Appellant is not entitled to reversal on his claim of error in the admission of written custodial statements*............................................................45

Conclusion……………………………………………………………………...50

Prayer…………………………………………………………………………...50

Certificate of Compliance……………………………………………………50

Certificate of Service…………………………………………………………...51

# INDEX OF AUTHORITIES

**Cases**

Alvarado v. State, 912 S.W.2d 199 (Tex. Crim. App. 1995)……………………..46

Brown v. State, 960 S.W.2d 265 (Tex. App.—Corpus Christi 1997, *no pet.*)…....48

Castillo v. State, 221 S.W.3d 689 (Tex. Crim. App. 2007)…………………….44fn33

Cocke v. State, 201 S.W.3d 744 (Tex. Crim. App. 2006, *cert. denied*)…………..38

Dowthitt v. State, 931 S.W.2d 244 (Tex. Crim. App. 1996, *cert. denied*)………..48

Druery v. State, 225 S.W.3d 491 (Tex. Crim. App. 2007, *cert. denied*)………….38

Ex parte Bowers, 886 S.W.2d 346 (Tex. App.—Houston 1994, *writ dism'd*)……48

Gomez v. State, 1999 Tex. App. Lexis 2918 at 3 (Tex. App.—Dallas 1999, *no pet.*)(*memorandum opinion—not designated for publication*)…………..49

Green v. State, 934 S.W.2d 92, 98 (Tex. Crim. App. 1996, *cert. denied*)………..47

Herron v. State, 86 S.W.3d 621 (Tex. Crim. App. 2002)……………………..38, 43

Jones v. State, 944 S.W.2d 642 (Tex. Crim. App. 1996, *cert. denied*)…………..47

Kunkle v. State, 771 S.W.2d 435 (Tex. Crim. App. 1986, *cert. denied*)………….40

Matthews v. State, 2013 Tex. App. Lexis 9251 (Tex. App.—Corpus Christi 2013, *pet. ref'd*)(*memorandum opinion—not designated for publication*)………………………………………………….44fn34

McNac v. State, 215 S.W.3d 420 (Tex. Crim. App. 2007)……………………..48

Moulton v. State, 508 S.W.2d 833, 836 (Tex. Crim. App. 1974)……………...39

Ransom v. State, 920 S.W.2d 288 (Tex. Crim. App. 1994)………………………48

Romero v. State, 716 S.W.2d 519 (Tex. Crim. App. 1986, *cert. denied*)……44fn33

Smith v. State, 332 S.W.3d 425 (Tex. Crim. App. 2011)……………………..39, 41

Solis v. State, 792 S.W.2d 95 (Tex. Crim. App. 1990)…………………………...42

Taylor v. State, 2013 Tex. App. Lexis 10129 (Tex. App.—Dallas 2013

(*memorandum opinion—not designated for publication*)…………...44fn34

Williams v. State, 974 S.W.2d 324 (Tex. App.—San Antonio 1994, *pet. ref'd,*

*cert. denied*)…………………………………………………………………42

Worthen v. State, 59 S.W.3d 817 (Tex. App. Austin 2001, *no pet.*)…………44fn34

Zuliani v. State, 903 S.W.2 812 (Tex, App.—Austin 1995, *pet. ref'd*)…………...47

**Statutes**

Tex. Code Crim. P. Art. 38.14……………………………………………….44fn33

Tex. Code Crim. P. Art. 38.22…………………………………………………45

**Rules**

Tex. R. App. P. 44.2……………………………………………………………48

## STATEMENT OF THE CASE

Appellant was charged by Indictment with Murder. CR1.

Appellant filed motions to suppress evidence including Appellant's written and recorded statements of accused; and a memorandum in support thereof. CR78, CR106, CR116, CR223. The trial court conducted evidentiary hearing thereon. RR vol. 17.

Appellant filed a *Motion for Identification Hearing Out of Presence of Jury*. CR101. The trial court, by written Order, granted Appellant's prayer for hearing. CR183. The trial court conducted evidentiary hearing thereon. Supp RR vol. 1.

Appellant filed his *Defendant Raul Trevino Lara, Jr.'s Specific Brady, Whitley and Bagley Request for Pre-Trial Determination of Codefendants' Intention to Invoke Their 5th Amendment Right to Remain Silent and for Hearing*. CR156. All codefendants declined, in pretrial conference, to at that point testify as to or give any indication of their intent regarding whether they would testify against Appellant in his trial. RR vol. 11.

The trial court rendered an *Order Granting Defendant's Motion for Discovery/Disclosure of Any Agreements Between the State of Texas and Any Witness That Court Conceivably Influence Testimony*. CR182.

Appellant was convicted of Murder as charged. CR221, 25RR5. Appellant submitted the issue of punishment to the jury, which rendered verdict sentencing

Appellant to 55 years' imprisonment. CR221, CR266, 26RR137. The trial court rendered Judgment in accordance with the verdicts of the jury. CR267. Appellant did not file a Motion for New Trial. Appellant timely filed Notice of Appeal. CR279.

## ISSUES PRESENTED

**<u>Issue One:</u>**

The trial court did not reversibly err in putting to the jury the determination of whether two particular witnesses were accomplices.

**<u>Issue Two:</u>**

Appellant is not entitled to reversal on his claim of error in the admission of written custodial statements.

# STATEMENT OF FACTS[4]

## A. Suppression

The trial court conducted a suppression hearing on a date before commencement of trial. RR vol. 17. Appellant was questioned on two separate occasions by different investigators.[5] 17RR11. Both interviews were recorded. 17RR12, 40.

### 1. Circumstances of the first interview

Appellant was apprised as to his *Miranda* warnings before the first interview and acknowledged his understanding of them. 17RR13, 27. Appellant elected to waive these rights and speak with officers; this waiver is memorialized in a written document and on the written statement of Appellant arising from this interview. 17RR13-14, 20, 23, 36; Supp. RR State's Exhibits 1-2; 28RR State's Exhibits 83-84. An interviewing investigator testified that there was no indication that Appellant's election to waive his rights was anything other than knowing and intelligent. 17RR28. Appellant at no point indicated any lack of understanding of or confusion about the rights as set out on the waiver form, and never requested clarification thereof. 17RR28, 30, 33. Appellant at no point invoked the right to counsel. 17RR28. This statement was not the product of threats or promises.

---

[4] As to physical objects admitted into evidence, the bound volumes of the Reporter's Record contain photographs of the objects rather than the objects themselves.

[5] Appellant was taken into custody before the first interview. 17RR11-12, 19-20.

17RR18. Investigators did, in the course of the interview process, convey to Appellant that they had already talked with other witnesses and, because others had implicated him, 'you might as well tell us what happened.' 17RR35. The statement, as reduced to writing, is a brief synopsis of the facts relayed by Appellant during this interview rather than a verbatim memorialization of his recitations. 17RR25.

The recording of this first interview was admitted for purposes of suppression hearing. 13RR16-18; Supp. RR State's Exhibit 3. The recording reflects the issuance of required warnings, and further reflects the acknowledgement by Appellant that he understood his rights, that he had read the written statement, that he willingly waived his rights, and that the statement did not result from any promises, threats, pressure or coercion. 17RR31-32.

### 2. Circumstances of the second interview

In light of additional information gained from other witnesses, authorities conducted a second interview of Appellant. 17RR38-39. As with the first interrogation, Appellant acknowledged and waived his rights vis-à-vis questioning and executed a written statement arising in this second interview. 17RR39-41, 48; Supp. RR State's Exhibits 4-5; 28RR State's Exhibits 85-86. Appellant's waivers

appeared to the investigator as having been made knowingly, intelligently and voluntarily. 17RR41-42, 57. On cross-examination, the investigator acknowledged that, after advising Appellant of his rights, Appellant affixed his initials to the waiver form only upon the investigator's saying to Appellant something akin to, 'ok, then…I'll need your initials here.' 17RR65. The statement itself set out that it was made by Appellant knowingly and voluntarily. 17RR76; Supp. RR State's Exhibit 5; 28RR State's Exhibit 86. Appellant did not appear in any way confused as to his rights, and did not request further explanation of them. 17RR42. He did not invoke his rights at any point in the interview process. 17RR43. Although execution by Appellant of the statement itself was witnessed by police department personnel other than the investigator, the execution by Appellant of the preliminary waiver form was not. 17RR50-52. The written statement is a summary of facts conveyed by Appellant during this interrogation rather than a verbatim transcription of the interchange between Appellant and the investigator. 17RR53-54. Appellant was offered the opportunity to draft the written statement himself but elected to have the investigator do so. 17RR55. After preparation of a draft statement, Appellant was given the opportunity to review it, change it, to add to it, and to delete from it before signing but did not indicate need of, request or demand any such alterations. 17RR55-56, 62.

The investigator who conducted the second interview conceded in cross-examination that he would have elected not to employ certain approaches to questioning used in Appellant's first interrogation. 17RR70-71. In response to the question from Appellant's counsel, "And you wouldn't have done it [taken the first investigator's approach] because that would have been coercive?", the officer responded, "No. I have different techniques." 17RR71.

Whereas the first interview was recorded only in an audio format, the second was recorded on video with accompanying audio recording. 17RR40; Supp. RR State's Exhibit 6. This recording memorializes the issuance of required warnings; in fact, depicted thereon is Appellant reading a form associated with his waiver of rights. 17RR40, 59, 72-73. On the recording, Appellant recites that he was willing to disclose facts and answer questions and did not wish the presence of an attorney, acknowledged understanding of his rights, and stated that no promises to or pressure against him were made or employed to persuade him to make the statement. 17RR73. The following colloquy sheds further light on Appellant's level of understanding:

> Question (from Appellant's trial counsel): Okay. So once again, that begs a question. What did you refer to when you said that he apparently understood his rights? You don't even know if he can read. You don't even know if he can write.

Answer (from the investigator): I know he can read because he read the waiver.

Question. Right. And, so, again, lastly, your presumption that Mr. Lara understood his Miranda warnings well enough to have knowingly, intelligently and voluntarily waive them is based solely on his reading of the waiver language in (the waiver form and statement admitted into evidence)"?

Answer: No, sir. On the video it actually shows him agreeing and nodding his head that he understood his rights.

17RR75-76

### 3. Arguments and ruling

On the date of the suppression hearing, Appellant filed his *Memorandum of Defendant Lara's Motion to Suppress Written Statement of Accused*. CR223. In light of the lack of opportunity for the State and the Court to have read the said document before argument and ruling, Appellant suggested that the Court entertain argument of the parties and then take the matter under advisement rather than ruling immediately. 17RR78.

One line of argument advanced by Appellant posited that, as the initial waiver form admitted as Supp. RR State's Exhibit 1, 4 / 28RR State's Exhibit 83, 85 and the statements of accused admitted as Supp. RR State's Exhibit 2, 5 / 28RR State's Exhibit 84, 86 were separate documents, the said statement allegedly did not meet

14

the requirement set out in Tex. Code Crim. P. Art. 38.22 sec. 2(b) that it was not in fact shown on the face of the statement that the accused, prior to and during the making of the statement, knowingly, intelligently and voluntarily waived his rights. 17RR79-80. Connected with that reasoning is the further claim of Appellant alleging the statement to be in admissible on grounds that there is nowhere in the statement or on the recording any express question as to whether Appellant, as the accused, wished to waive his rights. 17RR74, 83. Appellant also contended that the first statement was the product of coercion. 17RR84. Appellant also contended that his claimed lack of formal education rendered him incapable of making a knowing, intelligent and voluntary waiver. 17RR83.

The prosecutor responded that review of the video recording and documents conclusively established that Appellant did in fact adequately comprehended his rights and made a valid waiver thereof; and that the waiver document and the statement established that all required cautions were issued. 17RR86. As to Appellant's level of intellectual understanding, the prosecutor made the following observations:

> The mere fact that even if you were to assume that this Defendant cannot read[6],he did understand what was going on, he did understand

---

[6] Which assumption is directly contradicted by the video itself, which portrays Appellant reading certain documents albeit with slight difficulty.

questions posed to him. He did understand those questions because he provided intelligent answers to those questions. Not only the warnings, not only the waivers, but the actual questions about the offense itself. He is intelligent enough to understand what these words mean. He is intelligent enough to understand that this is a waiver. To know that this is a waiver. To voluntarily make this waiver of those rights, both at the beginning of the interview, and through the interview, and to the end of the interview…If you listen to the entire interview, not just the portion in isolation of the warnings, you begin to understand the level of intelligence of this defendant.

17RR92-93

Appellant, in contrast, took the position that "[t]he voluntariness has to be heard in a vacuum...".  17RR102.

Both State and defense stipulated that all arguments as to the admissibility of the waiver, statement, and recording connected with the initial interview would apply equally as to the admissibility of documents and recording of the subsequent interrogation, with the defense making a further and more particularized argument as relates to the waiver form associated with the second statement. 17RR96. As to the recordings, Appellant raised further complaint that "both of these oral statements are rife with inadmissible evidence, gang affiliation of Mr. Lara, rife with prior convictions of Mr. Lara, rife with Mr. Lara's previous trip to the

penitentiary" in addition to segments involving information from codefendants who could assert the 5th Amendment right not to testify. 17RR98-100. The prosecutor stipulated as to the impropriety of playing the recordings in their entirety before the jury and agreed to take measures to ensure that portions to which the jury should not be exposed would not be played in the jury's presence. 17RR99-100; 1Supp. RR12. As to the mechanics of how to accomplish the task of allowing review by the jury of only portions of the recordings held to be proper, Appellant's attorney made the following remarks:

> The understanding that I had from the State on Friday when we were here at that suppression hearing was, in fact, that the video and the audio could not be enhanced to be redacted as the Court has ordered, which only leaves me with one conclusion and that is that counsel will be pausing and playing and pausing and playing when ultimately published to the jury during the trial. Our objection is that those portions that are being redacted for purposes of being published to the jury are being admitted into evidence. In other words, once the jury retires to deliberate, they are entitled to review this evidence. These audios and videos are being admitted without actually being redacted as the Court is ordering.
> 1Supp. RR14.

The prosecution suggested that this potential issue could be avoided by, in the event the jury asked to review the recordings while deliberating the case, returning the jury to the courtroom and playing the proper portions rather than sending the

17

exhibits themselves into the jury room for consideration. 1Supp. RR15. This issue was discussed again, during trial but outside the presence of the jury. 20RR87-88.

At the conclusion of the evidentiary hearing, the trial court advised that the matter would be taken under advisement for review of memoranda and authorities. 17RR94. The trial court subsequently orally denied the suppression motions as to both written statements and both electronic recordings. 1Supp. RR5-7. The trial court was aware of the requirement for making and filing findings, conclusions and an order regarding the admissibility of the challenged statements; and Appellant made a specific and express request therefor. 17RR97; 1Supp. RR7.

The defense objected to presentation of the recordings to the jury without the preparation and submission of a transcript of these interviews. 1Supp. RR 13.

B. Agreements for testimony

Lucinda Tijerina and Julissa Tijerina, both of whom were juveniles at the time of the offense, were taken into custody and detained in connection with the shooting. 22RR79, 112. Neither was subject of a petition alleging delinquent conduct in connection with this matter.

The following colloquy transpired during a pre-trial conference:

(trial counsel for Appellant): There has been, for the record as I understand, a 'reveal the deal' motion[7], which has already been urged and granted by the Court. At best we would like the record once again to reflect today by way of Mr. Lopez (referring to prosecutor Roberto 'Bobby' Lopez, Jr.), that of the codefendants who have been arrested, charged, indicted and now are facing trial in this case, that there is no agreement with any of them to testify against Mr. Lara.

(the prosecutor): Judge, there is no agreement in relation to any of the codefendants to testify against Mr. Lara. We don't anticipate any agreements being reached. And we don't anticipate any codefendants being called to testify.

(trial counsel for Appellant): And, to supplement that, Your Honor, we also understand at that (*sic*) there [were] two juveniles arrested in this case, and charged originally. However, those juveniles' cases were later disposed by way of dismissal. And so, although they are no longer codefendants, we would once again ask the Court to reflect by way of Mr. Lopez that no deals have been made as it relates to those particular witnesses.

(the prosecutor): Judge, I don't believe any deals were made as to those particular witnesses. However, they are dealt with [by] separate prosecutors in the juvenile division. I can double check.

---

[7] This by all indications is a reference to Appellant's *Motion to Require the State to Reveal Agreements Entered Into and Between the State and Its Witnesses*, in the record at CR62. The trial court rendered an order granting this motion, which order is in the record at CR182.

Those particular defendants, I believe, were dismissed before these cases were brought before us, Your Honor.
14RR20-21

In the course of trial but outside the presence of the jury, the prosecution advised the Court that Lucinda Tijerina had accepted an offer of immunity "for anything that she did that night, or anything associated with this murder investigation…She will not be prosecuted for those actions for any testimony that she gives related to those actions…" in exchange for her testimony in Appellant's trial. 20RR114-115. This witness was then sworn, whereupon she was examined by her attorney and by Appellant's counsel as to the immunity agreement. 20RR117-119. Before she was summoned to testify before the jury, this witness was admonished as to the substance of certain *limine* motions and rulings. 22RR13-15.

The trial court conducted a similar proceeding regarding witness Julissa Tijerina. 22RR25-31. The prosecutor advised the Court and Appellant that, "Judge, just for purposes of the record, Ms. Tijerina has been offered immunity in exchange for her testimony regarding the murder…and her alleged involvement in that murder and any other involvement she may have had in the aftermath…" 22RR26.

Both Julissa and Lucinda had given statements to authorities before immunity was discussed, offered or granted. 22RR82-83, 129.

C. Trial on the merits / adjudicative facts

1.) Evidence

A resident of the neighborhood in which the killing occurred testified that, on the night in question, he heard what sounded to him to be fireworks. 19RR28. He then discovered that a bullet had struck his home. 19RR28. Authorities were summoned "so they can come and see the hole." 19RR31. A spent bullet was recovered from the structure. 19RR136-137. Another man attested to having heard "what sounded like really loud Black Cat firecrackers, like a popping sound." 19RR60.

Witness Stevie Ray Aguilar ('Aguilar') testified that, on that night, he, Miguel Vasquez and Ivan Lopez had decided to go to a restaurant and went to the home of another friend to determine if this person wanted to join them. "Well, we had just gotten there, and we just pulled up. And when we pulled up they were having like sort of a, I guess like a get together in the parking lot (depicted in State's Exhibit 4, in volume 27 of the Reporter's Record). And they were just all hanging there, drinking, like relaxing. There was no loud music. It wasn't a party there." 19RR40. Aguilar saw ten to twelve people gathered on the lot, most if not all of whom were

male. 19RR41. Vehicles in the vicinity included "Steve's black GTO, Joe B's[8] truck, and I think it was a maroonish Malibu Impala." 21RR11.

An argument erupted, with one girl telling two others to leave the gathering. 21RR32-33. At this point the two girls directed to leave, Lucinda Tijerina and Julissa Tijerina, did in fact depart on foot. 21RR33.

Lucinda Tijerina testified that she went to the location along with several other girls, including her cousin Julissa, to 'party.' 22RR42-43 She and her friends were directed to leave the gathering because they were underage; moreover, Lucinda was advised in a telephone conversation with her sister, Yaritza Tijerina "[t]hat her mom wanted us to go home." 22RR48, 95. Lucinda asked for a ride but found no one willing to give her one. 22RR49. As Julissa Tijerina testified, "Well, at first we asked Crystal to give us a ride, but she said that she didn't have any gas. So me and Lucy (referring to Lucinda) just – we started walking." 22RR96. After leaving the area on foot, Lucinda's sister Yaritza Tijerina picked the two girls up at a location away from the gathering, in Yaritza's van. 22RR50, 97.

---

[8] A reference to Joe Brandon. 21RR10.

The van, with several occupants, then returned to the location of the gathering and passes by it. 22RR54-55, 99. The van then makes a 'u-turn', returns to the site of the party, and stops. 22RR55, 99-100.

Aguilar testified that, "When we had gotten there we noticed a van sort of like pass by us. And at first we didn't really think anything of it. But it ended up that was – that the van was there who came and shot up."[9] 19RR43. According to other witnesses, the van was driven by a man when it first past the gathering, but upon return was driven by Yaritza Tijerina.[10] 20RR130; 21RR59, 80-81. "When the van came back, that's when I noticed that they had opened the side door[11], and one of the individuals in the van called out to one of the individuals in the party in the parking lot. And when he called them out, all he was saying was something that do not be messing with his 'prima'[12]." 19RR47; 22RR55. Aguilar testified that this

---

[9] This van was known to witnesses to belong to Yaritza Tijerina, a relative of Julissa Tijerina and Lucinda Tijerina. 21RR39, 56-57.

[10] One witness identified the driver in the first pass as 'El Negro' (Eric Atwood), who is the husband of Yaritza Tijerina. 20RR128; 21RR79-80. This witness later attested that she was not in fact certain of her identification regarding the male driver on the first pass, but "If Yaritza goes, Negro is always with her." 21RR80. Lucinda Tijerina and Julissa Tijerina both confirmed that it was Atwood who was initially driving the van. 22RR51, 97.

[11] The van in question has a passenger-area door on each side that slides rearward. 19RR178; 28RR State's Exhibits 71-73.

[12] 'Female cousin.' New Revised Velazquez Spanish and English Dictionary, Follett Publishing, 1974.

23

remark was directed at 'J.B.'[13] 19RR47-48. Juan Pablo Sosa, the person who replied, testified that, "I responded with, 'What's up?' Because I did not know what he was talking about." 21RR219.

As to the actual deadly act, Aguilar testified that:

> After that, I guess the individual in the van got irritated or something, and that's when I noticed he pulled out a pistol…When I saw him pull out the pistol, I notice how 'J.B.' reacted to it. And I see him take a few steps back like he's going to run. And that's when I heard the man, the individual, just cocked the gun. And when I heard him cock the gun, he also threw like a sort of like a little towel or something over it.[14] And when he did that, that's when I noticed 'J.B.' run…When they (the other people in the parking lot) noticed him run, they started to scatter. And they scattered. That's when he started shooting.
> 19RR480-49.

---

[13] Later testimony established that the person knows as 'J.B.' is Joe Brandon. 21RR10. A possibility exists that Aguilar in fact said 'J.P., in light of testimony that another witness that it was 'J.P.', Juan Pablo Sosa, who in fact was engaged in discussion with a person in the van. 21RR7, 15.

[14] This towel was recovered from the suspect vehicle and admitted into evidence. 19RR175-177.

Witness Antonio Navarro described the episode as follows: "After they (the person in the van and J.P.[15]) exchanged words, he pulled out a gun, asked him one more time, 'Are we cool?' J.P. said, 'Yes.' He took a step back, and once he did, he loaded it." 21RR18. Lucinda Tijerina and Julissa Tijerina testified that both Appellant and another occupant opened fire, each with his own weapon. 22RR56-58, 101. Julissa identified both gunmen in initial statements to authorities as well as in her trial testimony. 22RR130. Navarro testified that it did not appear that Miguel Vasquez' automobile was a specific target. 21RR19. Another witness testified that gunman was "[S]hooting. Just shooting…Yeah. At the crowd, everybody." 21RR169.

In an attempt to avoid being struck by gunfire, Aguilar 'ducked down' in the back seat of Vasquez' automobile as Vasquez attempted to drive away from the scene. 19RR50. When asked, "Did you feel the car begin to move?", Aguilar responded, "No. I just heard when the glass was shattering and the bullets were hitting the car[16]…The car starts moving slowly. Like when everything happens, I just hear my friend Ivan say Miguel was shot and that the car was moving slowly, like if they had put it in neutral." 19RR51. The victim's automobile was struck by multiple

---

[15] Juan Pablo Sosa. 21RR214.
[16] Another vehicle in the area was also struck by gunfire. 19RR100-103.

projectiles, at different angles.[17] 19RR105; 20RR93-94. Miguel Vasquez, the driver, was unable to move the vehicle because "he couldn't press on it (the accelerator pedal) because he was hit. So the car kept moving on its own. And I had to stop the car. I had to step on the brakes to stop it." 19RR52. This was accomplished when "[h]e (Aguilar) was able to step out of the car, open Miguel's driver door, put the step on the break (*sic*), and put the car in park." 21RR182. Aguilar was unable to identify the person who opened fire. 19RR55, 58.

Responding officers transported numerous witnesses to department headquarters for questioning as to their knowledge of the shooting. 20RR97-100. Officers were thereafter dispatched to a particular property based on information provided by one or more witnesses. 20RR101-102. As noted above, a van matching the description provided by witnesses of the suspect vehicle was discovered at that location. 19RR184-185. Officers made contact with witnesses believed by officers to have information relevant to the shooting. 19RR183, 186; 20RR103. Julissa Tijerina, Lucinda Tijerina, and their mother were present. [18], [19] 19RR186. Julissa and

---

[17] Rods tracking and illustrating the bullets' trajectories are depicted in State's Exhibits 40-50, within volume 28 of the Reporter's Record.

[18] The State of Texas will hereinafter on occasion refer to witnesses and involved parties who have similar last names by their first name only.

[19] "Yaritza Tijerina, Martin Tijerina and Lucinda Tijerina are siblings. Julissa Tijerina is their cousin." 20RR107, 201-202; 22RR37, 91. Eric Atwood is Yaritza's husband. 20RR128; 22RR37. Marissa Tijerina is the mother of Yaritza, Martin and Lucinda. 22RR122.

Lucinda were also believed to have been witnesses to the offense. [20] 19RR187; 20RR103. Julissa pointed out for investigators the residence of Appellant. 19RR187-188.

Witness Nicholas Zapata saw the face of the shooter and, upon viewing images in news media depicting Appellant in a post-arrest proceeding, recognized Appellant as the gunman and so advised authorities. 21RR102-104, 112. As this witness put it, "But I remember a face. I'm not going to forget a face after they shoot at you." 21RR114. Other witnesses also identified Appellant as being the person who opened fire. 21RR144-145, 166, 199-201, 226-227. Juan Pablo Sosa testified as follows, regarding recognizing Appellant and notifying law enforcement officials:

> Question (from Appellant's trial counsel): There's been testimony that Mr. Lara was in fact arrested October the 8th. Why did you wait 22 days to go back to the police department to tell them that the shooter –
>
> Answer (from Juan Pablo Sosa): Because I got that newspaper, and I recognized Mr. Lara in the newspaper. And I

---

[20] According to witnesses, Atwood was the driver of the van, Yaritza was the right passenger, and Appellant and Leonardo Moreno were in the middle seat; Julissa and Lucinda were also reportedly in the van. 20RR175. As to the reported involvement of Jorge Caballero, "We did research on Jorge Caballero through the investigation, later his name was cleared. He was not in the van." 20RR175, 198, 205.

recognized him because you will never forget who would want to take your life. And you could actually picture him. You'll never forget. 21RR228-229.

Zapata and other witnesses identified Appellant in trial as being the same person they saw on the night in question firing a weapon. 21RR104-105, 117, 201-202.

One witness identified the gunman as Eric Atwood, testifying that she recognized his voice in demanding that the other person keep away from his cousins and that this witness saw a gun in Atwood's hand when the van passed the second time. 21RR81-82. This witness, however, conceded that she did not see the actual gunplay. 21RR83. Moreover, as she had never heard the voice of Appellant, she admitted that she had no way of knowing whether Appellant's voice was similar to Atwood's. 21RR86. This witness' response to the question, "So the reason, and the only reason, that you told the police that the person that was talking to them was Negro[21] was because that's the voice that you thought you heard", the witness responded, simply, "Yes." 21RR86-87.

After leaving the area following the shooting, Appellant told the other people in the van "[t]hat he hadn't done that in a long time." 22RR61. Julissa testified that Appellant said "[i]t was fun." 22RR103. Upon arrival at the home of one of the

_____

[21] This is a reference to Eric Atwood. 22RR38 lines 1-2.

28

occupants, Appellant and Leonardo Moreno started looking through the van for any evidence of the shooting such as cartridge casings. 22RR62-63, 104.

2. Appellant's custodial statements

a. Appellant's first custodial statement

Appellant's first interview was conducted by Investigator Ileana Pena. Before questioning Appellant, Pena advised Appellant of his rights; Appellant acknowledged issuance and understanding thereof and elected to waive his rights.[22] 20RR108-109, 181-182; 28RR State's Exhibit 83. No threats were made against Appellant during the interview process. 20RR155. Appellant read the waiver form before executing it, and manifested understanding thereof. 20RR181. This investigator employed the interview tactic of advising Appellant, as the accused, that officers had already spoken with and obtained information from other witnesses that tended to implicate Appellant. 20RR141-142. The interviewing officer did not advise Appellant of witness statements indicating another person, 'El Negro' (Atwood) was the shooter. 20RR143. As to whether any untruths were conveyed to Appellant during the interview in an effort to obtain a statement from him, the following colloquy transpired:

---

[22] In his cross-examination of the investigator who took Appellant's first custodial statement, Appellant elicited testimony regarding the particular circumstances of the interview and statement and regarding the investigator's familiarity with the rights of an accused. 20RR136-140.

Question (from Appellant's trial counsel): We've learned a little bit during this trial, Sergeant Ruiz, that it's permissible and even course of conduct for investigators to lie to people that are being interrogated, is that correct?

Answer (from a second investigator involved in the initial custodial interview of Appellant): We don't. That's not our practice, no.

Question: So you don't tell them things that are not true so that you can get the truth out of them?

Answer: That's not exactly – that's not our practice.

Question: So you are now saying to the ladies and gentlemen that things that are not true are not told to people so they can say a truth?

Answer: We don't use that tactic. That's incorrect.

Question: So you didn't tell Mr. Lara that everyone was pointing the finger at him?

Answer: That is not a lie. That's true.

Question: Okay. But you're also aware that Jasmine had not pointed the finger at him. Jasmine pointed the finger at Atwood?

Answer: That is Jasmine. Every witness views certain areas. Not everybody saw everything.

20RR191-192.

In his first written statement,[23] Appellant disavowed any knowledge of the shooting whatsoever.[24] 20RR183, 192; 28RR State's Exhibit 84. Pena did not

---

[23] The copy thereof which was admitted into evidence for consideration of the jury was partially redacted. 28RR State's Exhibit 84.

perceive Appellant's factual recitations as truthful. 20RR120. Pena then made further contact with several witnesses. 20RR120-121.

### b. Appellant's second custodial statement

Following Appellant's first interrogation, "We (members of the investigative team) had a meeting with our division lieutenant…Investigator Ileana Pena was the case agent and during the course of the interview briefing with them, they asked me (Sergeant Orlando Garcia) to reinterview him to see if I could get more information from him for the case." 20RR206-207. Garcia testified that it was law-enforcement officials, rather than Appellant himself, who initiated this second interview. 20RR233-234.

As was done before the first interrogation, Garcia advised Appellant as to his rights and obtained Appellant's written waiver thereof before commencing this second custodial interview. 20RR207-208; 28RR State's Exhibit 85. Appellant himself read the waiver form aloud before signing it. 20RR209. Garcia conceded on cross-examination that he directed rather than requested that Appellant affix his initials and signature on the waiver document. 20RR223-225. Garcia further conceded on

---

[24] In cross-examination of the officer who took Appellant's second statement, the defense noted the distinction between Appellant's assertion in his first statement of 'I do not remember' and an affirmative statement of 'I do not know.' 20RR222.

cross-examination that the witnesses whose signature appears on the waiver form admitted as State's Exhibit 85 did not in fact observe the issuance of the rights set out on the document. 20RR231-232. The investigator emphasized that the waiver was obtained before the interrogation began. 20RR226. Although given the option to draft the statement himself, Appellant elected to have the officer do so. 20RR230. It appeared to this investigator that Appellant understood his rights and that his waiver was made knowingly, voluntarily and intelligently. 20RR208-209. Apart from the waiver form itself, required warnings were again issued and appear on the statement admitted as State's Exhibit 86 itself. 20RR237-238. Appellant did not invoke any of his rights at any point. 20RR234-235.

In his second written statement,[25] Appellant admitted having been in the van during the episode but denies having interacted with any of the people on the parking lot and implicated 'Little Bear' (Leonardo Moreno) as being the person who opened fire and stated, "I don't know what happened to the gun that 'Little Bear' used.[26] 20RR213;28RR State's Exhibit 86. Appellant, who states he was initially in the middle seat of the vehicle but at some point moved to the rear seat,

---

[25] The copy thereof which was admitted into evidence for consideration of the jury was partially redacted. 28RR State's Exhibit 86.

[26] As discussed elsewhere herein, authorities determined that Jorge Caballero was not in fact in the van at relevant times. Appellant, in his second written statement, does not identify Caballero as among the people Appellant states were in the vehicle. 20RR217; 28RR State's Exhibit 86.

then avers that, from the rear seat of the van, he was able to open the driver-side passenger door.[27] 20RR212-213; 28RR State's Exhibit 86. The testifying officer attested that, to be able to reach a passenger door latch from the rear seat in such a vehicle, "You'd have to be very, very tall." 20RR213-214.

D. Charge of the Court/final argument

Other than mention of a need for a correction in the charge as to the case number, which correction was made without objection, the record memorializes no discussion of the proposed jury charge. 23RR5. The record is devoid of any objection to the charge as proposed and of any requests for additions, deletions or changes thereto. The defense, on two occasions, affirmatively stated there was no objection to the jury instructions as proposed. 23RR5-6.

The charge is in the Clerk's Record at CR250; and the memorialization of the reading of the charge to the jury is memorialized at 23RR8-17. The jury charge instructed the jury on the law pertaining to statements of an accused. In the instructions pertaining to accomplice testimony, the trial court put before the jury the question as to whether Julissa Tijerina and Lucinda Tijerina were either or both

---

[27] As noted hereinabove, the van in question has passenger doors that latch at the front of the passenger compartment and slide rearward on a track. 19RR178; 20RR213; 28RR State's Exhibits 72-73.

accomplices rather than deeming either or both of them to be an accomplice as a matter of law.CR254-256. The trial court, as to this issue, instructed the jury that:

> Upon the law of accomplice witness testimony, you are instructed that a person who has participated with someone else before, during or after the commission of a crime, is an accomplice witness. *In such a case, there must be some evidence of an affirmative act on the witness' part to assist in commission of the offense.* If a witness cannot be prosecuted for the offense with which the accused is charged, then the witness is not an accomplice witness as a matter of law. A witness is not an accomplice witness merely because he or she knew of the offense and did not disclose it, or even concealed it. *The witness' presence at the scene of the crime does not render the witness an accomplice witness.*
> CR254-255 (*emphasis added*).

The prosecutor, in discussing the issue of whether Julissa and/or Lucinda should properly be considered accomplice witnesses, noted that there had been no evidence adduced of any affirmative act by either in furtherance of the commission of the offense. 23RR32. Further, even if deemed by the jury to be accomplices, "[y]ou can still consider the testimony if what they provided is corroborated by some other evidence tending to connect the Defendant with the offenses charged. What other corroborative evidence? The eyewitness testimony, the fingerprints,

Mr. Lara's own statement puts him in the car. It even puts him in that same middle seat…" 23RR33.

The record is devoid of any reference by the defense to any affirmative act alleged to have been committed by either Julissa or Lucinda in furtherance of the crime, by which either or both of them could properly be found by the jury to be an accomplice.

# SUMMARY OF ARGUMENTS

The trial court did not reversibly err in submitting to the jury the question as to whether either or both of two particular witnesses were accomplices rather than deeming them accomplices as a matter of law. The fact that a witness is testifying under and pursuant to a grant of immunity does not without more render that witness an accomplice as a matter of law. Neither of the subject witnesses were subject of any charging instrument alleging any criminal or quasi-criminal liability in the offense at issue. The evidence did not show an affirmative act in furtherance of the killing by either of these witnesses.

The trial court did not err in its rulings admitting Appellant's two written statements. Neither was the product of force, threats, improper promises, or coercion. Each was made and executed by Appellant voluntarily and intelligently. Even if error is found, Appellant is not entitled to reversal on this claim because the statements did not contribute to his conviction.

## NOTE AS TO ORAL ARGUMENT

Appellant has requested oral argument. The State of Texas respectfully submits that oral argument in the case at bar would not serve to enlighten the Court further or illuminate the issues in that, because the facts and legal arguments are adequately presented in the briefs and record, the decisional process of the Court would not be significantly aided by oral argument. The State of Texas, therefore, respectfully submits that oral argument in the instant case is not necessary and that the request for oral argument should be denied.

The State of Texas reserves the right to present oral argument should the Court grant the request of Appellant for oral argument.

## ARGUMENTS AND AUTHORITIES

**Issue One:** The trial court did not reversibly err in putting to the jury the determination of whether two particular witnesses were accomplices.

A witness is an accomplice as a matter of law only when, either based on trial evidence or the status of the witness as having been charged for the subject offense, "[T]here exists no doubt that the witness is an accomplice." Druery v. State, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007, *cert. denied*). Appellant's claim of error in the jury instructions is grounded on a contention that the court did not properly charge the jury as to accomplice witnesses in that the trial court left to the jury the determination of whether either Lucinda Tijerina or Julissa Tijerina, or both of them, were accomplices rather than instructing the jury that both were deemed accomplices as a matter of law. CR255. It is beyond dispute that a trial court is bound to issue a proper instruction as regards any testimony from a witness deemed or established by evidence as being an accomplice as a matter of law. Herron v. State, 86 S.W.3d 621 (Tex. Crim. App. 2002). Conversely, if the status of a witness is subject to dispute in light of the evidence, the trial court is to leave to the jury the determination as to whether a person is an accomplice, thus requiring that the witness' testimony be corroborated to sustain conviction. Cocke v. State, 201 S.W.3d 744 (Tex. Crim. App. 2006, *cert. denied*).

38

In advancing the argument that the trial court should have deemed both of these witnesses to be accomplices as a matter of law, Appellant points to the indisputable fact that both were testifying under a grant of immunity. However, a grant of transactional immunity does not, in and of itself, mean that a witness' status is that of an accomplice as a matter of law:

> The main thrust of the objection was that since Sandoval had theretofore been granted immunity by the State, "that in and of itself makes him an accomplice to the offense with which this defendant is charged"…The mere fact that State granted transactional immunity to Sandoval did not, *ipso facto*, change his status into that of an accomplice as a matter of law…The most that appellant was entitled to receive in the charge was a submission of the question as one of fact.
> Moulton v. State, 508 S.W.2d 833, 836 (Tex. Crim. App. 1974)

Likewise, although a person testifying while a charge related to the case on trial is pending is an accomplice as a matter of law or agrees to testify in consideration of a dismissal of such charges, in the instant case no charging instrument was ever brought against either Lucinda Tijerina or Julissa Tijerina. *See*, Smith v. State, 332 S.W.3d 425 (Tex. Crim. App. 2011). While both of them were initially suspected of involvement with and detained in connection with the killing, both were released soon thereafter and neither was subject of a charging instrument related to

the murder at issue. 14RR21; 22RR112. Both Julissa and Lucinda had given statements to authorities before immunity was discussed, offered or granted. 22RR82-83, 129. Moreover, in addition to conveying information to law enforcement authorities, more than a year before trial Lucinda testified before the grand jury without any grant of immunity.[28] 22RR82-83. An agreement of immunity for Lucinda was reached in the days before Appellant's trial, and the agreement regarding immunity for Julissa was reached during trial itself. 22RR82, 109-110. Stated more simply, neither Lucinda nor Julissa were ever charged by prosecutorial authorities for any act connected with the instant offense, no charges against either were pending at time of the instant trial, both had given statements upon initial contact with law enforcement authorities with no grant of immunity, and Lucinda had also testified before the grand jury long before the matter of immunity was raised.

For a witness to be considered an accomplice witness based on evidence of the person's role in the commission of an offense, "[T]here must be some evidence of an affirmative act by the witness committed to assist in commission of the offense before that witness may be considered an accomplice." Kunkle v. State, 771

---

[28] The instant trial was conducted in December, 2013; Lucinda testified before the grand jury "back in November of last year." 22RR82-83.

S.W.2d 435, 441 (Tex. Crim. App. 1986, *cert. denied*).[29] Mere presence during the commission of an offense does not make a person an accomplice. Smith, 332 S.W.3d 425. There was no evidence adduced of an affirmative act by either that would necessitate a finding of either or both being an accomplice as a matter of law under the evidence presented. *Id.* (when doubt exists as to whether a witness is an accomplice, trial court may leave this determination to the jury). As to Appellant's claim that Julissa was overheard saying something akin to, "shoot, but not at my friends," and thus was in fact susceptible to prosecution as a party, this testimony was later clarified:

> Question (from the prosecutor): We're talking about this conversation that you had on speaker phone. Explain again that conversation.
>
> Answer (from witness Jasmine Villegas): Conversation?
>
> Question: That you had with Julissa on speaker phone?
>
> Answer: First Jamika was texting her. Then she called. And she said if you knew your friends were there why did you shoot . And Julissa says: I told him not to shoot at my friends.
>
> Question: Now this is the affidavit, right?
>
> Answer: Yes.
>
> Question: Now, right now you're saying she told—that Julissa said she told the shooter not to shoot at her friends, correct? Did Julissa ever say that she told the shooter to shoot at anyone?

---

[29] The trial court so instructed the jury. CR254-255.

Answer:          No.[30]

21RR90

Neither Julissa nor Lucinda was an accomplice as a matter of law either by virtue of status in a prosecution or under the evidence adduced at trial; thus, the trial court committed no error in submitting this question to the jury.

Even if error is found, reversal of conviction is not warranted. This case does not present a circumstance in which *no* accomplice instruction was issued; rather, Appellant's argument rests upon the contention that the trial court should have, but did not, *sua sponte* issue a 'matter of law' declaration rather than submitting the question to the jury. Restated, the issue is not an omission of an accomplice-witness instruction but instead rests on a claim that the trial court issued the *wrong* instruction. In light of the lack of any objection to or request for an instruction to be included within the charge, Appellant is not entitled to reversal absent a showing of egregious harm. Solis v. State, 792 S.W.2d 95 (Tex. Crim. App. 1990); s*ee,* Williams v. State, 974 S.W.2d 324, 328 (Tex. App.—San Antonio 1994, *pet. ref'd, cert. denied*)("Since Williams requested and received an accomplice as a matter of fact instruction as to each of these witnesses, Williams must show that the trial court erred in failing to submit an accomplice as a matter

---

[30] It is noteworthy that the defense did not question Julissa about this claimed conversation during her testimony.

of law instruction and that such error, if any, resulted in egregious harm to Williams."). Under this standard, omission of a proper accomplice instruction is generally harmless unless the corroborating evidence is so weak as to render the prosecution's case 'clearly and significantly less persuasive.' Herron, 86 S.W.3d at 632. Appellant cannot make such a showing.

The Appellant himself, in the written statement admitted in trial as State's Exhibit 86, gives evidence tending to connect himself with the killing, in that he admits to having been in the vehicle during the shooting and opening the van's sliding door.[31] Moreover, his fingerprints on the vehicle provide further corroboration. 20RR77-81. More significant than this circumstantial evidence, though, is the identification of Appellant, by five independent witnesses[32] as the person who opened fire. 21RR102-10, 114, 144, 166, 199, 226. Even under a scenario in which the 'standard' rule as to requirement of corroboration was to be applied[33], let alone

---

[31] As admitted into evidence in trial, both written statements of accused were redacted, in part, to exclude portions therein as compared to the original statements. 28RR State's Exhibits 84, 86.

[32] The term 'independent witnesses', as used herein, means witnesses who are unconnected to Tijerina/Atwood family and who are in no way implicated in this crime. Much of Appellant's argument in trial and on appeal rests upon the supposition that Julissa and Lucinda lied to authorities, to the grand jury, and to the trial jury to protect Atwood and, possibly, other members of their family.

[33] The State of Texas would note that, in a 'sufficiency of corroboration' challenge, which is not raised in the instant case, the corroborating need not in itself directly link the accused to the crime or be sufficient in itself to prove guilt beyond a reasonable doubt; rather, corroboration is sufficient if the non-accomplice testimony tends to connect the defense with the offense alleged.

under the principle applicable here, Appellant has not shown the level of harm necessary to establish entitlement to reversal. Even wholly disregarding the testimony of Julissa and Lucinda, assuming *arguendo* error in not issuing a 'matter of law' instruction, there exists direct evidence in the record adequate to overcome Appellant's challenge.

As the verdict is general in form, there is no specific finding in this case as to whether the jury found that either Julissa or Lucinda Tijerina, either or both, was or was not an accomplice; it is thus not possible to ascertain, by the verdict, the determination made by the jury as to this question.[34] Assuming *arguendo* that neither of these witnesses were determined by the jury to be an accomplice, their

---

Tex. Code Crim. P. Art. 38.14; *see*, Romero v. State, 716 S.W.2d 519, 523 (Tex. Crim. App. 1986, *cert. denied*). "Under this rule, the reviewing court eliminates all of the accomplice testimony from consideration and then examines the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." Castillo v. State, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007).

[34] Texas courts have split on the question of whether, when the determination of whether a particular witness is or is not an accomplice is left to the fact finder rather than determined by the trial court as a matter of law, and verdict of guilt is rendered, a reviewing court should assume that the finder of fact determined the witness *not* to be an accomplice, in which event no corroboration is required, or *did* find the witness to be an accomplice, in which case conviction cannot stand absent sufficient evidence adduced through non-accomplices. *See, e.g.* Worthen v. State, 59 S.W.3d 817, 821 (Tex. App. Austin 2001, *no pet.*)(question of whether a particular witness was an accomplice was submitted to the jury; "[T]o the extent Debrow's testimony is necessary to sustain Worthen's conviction, we assume the jury found that he was not an accomplice."); *c.f.* Matthews v. State, 2013 Tex. App. Lexis 9251 at 38 (Tex. App.—Corpus Christi 2013, *pet. ref'd*)(*memorandum opinion—not designated for publication*), Taylor v. State, 2013 Tex. App. Lexis 10129 at 18 (Tex. App.—Dallas 2013 (*memorandum opinion—not designated for publication*)(same).

testimony would not be subject to a corroboration requirement. If, however, the assumption is made that the jury determined either or both to be, as a matter of fact, an accomplice, the 'accomplice witness' rule would apply to the testimony of that witness. There exists more than adequate other evidence tending to connect Appellant to this offense.

**Issue Two:** Appellant is not entitled to reversal on his claim of error in the admission of written custodial statements.

The trial court having now rendered factual findings, legal conclusions and orders regarding Appellant's custodial statements, as required by Tex. Code Crim. P. Art. 38.22 sec. 6, there exists no need to abate this appeal as suggested by Appellant; the prayer for abatement is moot, as the relief requested has been granted. Brief of Appellant 26-27; 1 Supp CR7.

Appellant contends error in the admission of his two written custodial statements based on his claim that each was involuntarily made.[35] The Texas Court of

---

[35] The State of Texas would note that, although both interviews of Appellant were recorded by electronic means, neither recording was offered or admitted into evidence at trial and thus necessarily could not have contributed to Appellant's conviction.

Criminal Appeals succinctly articulated the principles governing proceedings challenging the voluntariness of a statement in its opinion in Alvarado v. State:

> Once a defendant moves to suppress a statement on the ground of "involuntariness," the due process guarantee requires the trial court to hold a hearing on the admissibility of the statement outside the presence of the jury. *Jackson v. Denno*, 378 U.S. 368, 380, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964). Article 38.22, § 6 and Texas Rule of Criminal Evidence 104(c) have the same requirement. At the hearing, the trial court is the sole judge of the weight and credibility of the evidence, and the trial court's finding may not be disturbed on appeal absent a clear abuse of discretion. The burden of proof at the hearing on admissibility is on the prosecution, which must prove by a preponderance of the evidence that the defendant's statement was given voluntarily. A statement is "involuntary," for the purposes of federal due process, only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker. "Absent [coercive] police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Colorado v. Connelly, 479 U.S. at 164.
>
> Alvarado v. State, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995)(*certain internal citations omitted*)

In a suppression hearing, determination of facts on disputed evidence is solely within the province and discretion of the trial judge. *See, e.g.*, Jones v. State, 944 S.W.2d 642 (Tex. Crim. App. 1996, *cert. denied*); Green v. State, 934 S.W.2d 92, 98 (Tex. Crim. App. 1996, *cert. denied*)(trial court is in the best position to determine which testimony to believe and which testimony to disbelieve; determinations that rest upon findings as to credibility are within the sole province of the trial court.). As one Texas appellate court has stated:

> The trial court may accept or reject all or any part of a witness's testimony. In reviewing the trial court's decision, an appellate court does not engage in its own factual review; it determines only whether the record supports the trial court's fact findings. If the trial court's fact findings are supported by the record, an appellate court is not at liberty to disturb the findings absent an abuse of discretion.
> Zuliani v. State, 903 S.W.2 812, 819 (Tex, App.—Austin 1995, *pet. ref'd*)(internal citations omitted).

The trial court found that, as to both custodial statements, each was made voluntarily, without compulsion or coercion, upon a knowing and intelligent waiver of rights after proper admonishments, that each comported in all respects with the requirements of the law, and that Appellant at no time invoked his rights to silence or counsel. SCR7. These findings are supported by the record. 17RR13-14, 18, 20, 23, 28, 36, 27-33, 38-41, 43 48, 76; 20RR2108-109, 155, 181-182, 207-

209, 226, 234-235; Supp. RR State's Exhibits 1-2, 4-5; 28RR State's Exhibits 83-86. The conclusions of law that both statements were admissible are in all respects proper.

It is axiomatic that admission of an involuntary statement is of constitutional dimension; thus, reversal is required absent a finding beyond a reasonable doubt that such error did not contribute to the conviction of Appellant. Tex. R. App. P. 44.2(a); Ransom v. State, 920 S.W.2d 288 (Tex. Crim. App. 1994); *see, also*, Ex parte Bowers, 886 S.W.2d 346 (Tex. App.—Houston 1994, *writ dism'd*). The existence and weight of other evidence establishing the guilt of the accused is to be considering in conducting this harm analysis. *See, e.g.* McNac v. State, 215 S.W.3d 420 (Tex. Crim. App. 2007).

In determining whether any error in the admission of a confession contributed to a defendant's conviction, Texas courts have repeatedly looked to whether the statement incriminates the accused. *See, e.g.* Dowthitt v. State, 931 S.W.2d 244 (Tex. Crim. App. 1996, *cert. denied*); Brown v. State, 960 S.W.2d 265 (Tex. App.—Corpus Christi 1997, *no pet.*). In a case applying the principles set forth in Dowthitt, the Dallas Court of Appeals stated that, "In point one, Gomez complains of police testimony that he denied being involved in the collision but stated one of

the cars involved belonged to him. Regardless of error, we determine beyond a reasonable doubt that Gomez's statements did not contribute to his conviction. Compared to the testimony of how police found Gomez near the collision scene and the testimony identifying him as the driver, his statements had little incriminating value." Gomez v. State, 1999 Tex. App. Lexis 2918 at 3 (Tex. App.—Dallas 1999, *no pet.*)(*memorandum opinion—not designated for publication*). Nothing in the statements of Appellant regarding the events at issue were directly incriminating in nature. Moreover, other evidence of Appellant's guilt included but was not necessarily limited to the identification of Appellant, by five independent witnesses[36] as the person who opened fire. 21RR102-10, 114, 144, 166, 199, 226.

Even assuming *arguendo* that the trial court erred in admitting the two written statements, it is clear beyond a reasonable doubt that this evidence did not contribute to Appellant's conviction. Thus, any error, even assuming that it was preserved, is harmless and does not entitle Appellant to reversal of judgment.

---

[36] The term 'independent witnesses', as used herein, means witnesses who are unconnected to Tijerina/Atwood family and who are in no way implicated in this crime. Much of Appellant's argument in trial and on appeal rests upon the supposition that Julissa and Lucinda lied to authorities, to the grand jury, and to the trial jury to protect Atwood and, possibly, other members of their family.

## CONCLUSION

Appellee respectfully submits, for the reasons set forth herein, that the Judgment of the trial court was proper and should in all respects be affirmed.

## PRAYER

Wherefore, premises considered, the State of Texas prays the Court affirm the Judgment of the trial court.

Respectfully submitted,

_____/s/ Glenn W. Devino_____
Glenn W. Devino
Assistant Criminal District Attorney
Hidalgo County, Texas
100 N. Closner, 4th floor
Edinburg TX 78539
Telephone 956-318-2300
Facsimile 956-380-0407
State bar no. 24012525

**Certificate of Compliance**
I hereby certify that this Brief, including footnotes but excluding those parts listed in Rule 9.4(i)(1), Tex. R. App. P., contains 10,655 words

_____/s/ Glenn W. Devino_____
Glenn W. Devino
Assistant Criminal District Attorney
Hidalgo County, Texas
100 N. Closner, 4th floor
Edinburg TX 78539
Telephone 956-318-2300
Facsimile 956-380-0407
State bar no. 24012525

**Certificate of Service**

I hereby certify that I have sent a true and correct copy of the foregoing Brief of Appellee to Appellant, Raul Lara, which Brief is electronically filed, by serving Appellant therewith through the electronic filing manager to his attorney, Rolando Garza, on this the 19th day of September, 2015.

_____/s/_____Glenn W. Devino
Glenn W. Devino
Assistant Criminal District Attorney
Hidalgo County, Texas
100 N. Closner, 4th floor
Edinburg TX 78539
Telephone 956-318-2300
Facsimile 956-380-0407
glenn.devino@da.co.hidalgo.tx.us
State bar no. 24012525